452 S.E.2d 919

**ROBERT DARRELL O., Plaintiff Below, Appellee,**

v.

**THERESA ANN O., Defendant Below, Appellant.**

No. 22307.

Supreme Court of Appeals of West Virginia.

September 1994 Term.

Submitted Sept. 28, 1994.

Decided Dec. 20, 1994.

Sandra Sisson Bullman, Charleston, for appellee.

Charles R. Webb, Pepper & Nason, Charleston, for appellant.

PER CURIAM:

This is an appeal by Theresa Ann O. from an order of the Circuit Court of Kanawha County denying her petition for custody of her two infant children, the custody of whom

was previously awarded to her former husband. On appeal, the appellant claims that the evidence adduced demonstrates that the circumstances of the parties have changed and that the change of custody which she seeks will materially promote the welfare of her children. Under the circumstances, she claims that the Circuit Court of Kanawha County erred in denying her petition for modification of the previous custody award and for custody of the children. After reviewing the documents filed and the issues presented, this Court agrees with the appellant. The judgment of the Circuit Court of Kanawha County is, therefore, reversed.

The parties to this proceeding, Theresa Ann O. and Robert Darrell O., were divorced by order of the Circuit Court of Kanawha County entered on August 14, 1989. The final order incorporated a settlement agreement dated January 10, 1989, in which the parties agreed that Robert Darrell O. would be granted custody of the parties' two infant children, A.L.O., who is now twelve years old, and E.C.O., who is now ten years old. The settlement agreement also provided that the appellant was to have extensive visitation with the children.

After entry of the final divorce order, the appellant married a captain in the United States Army, who was subsequently stationed in Germany and in Virginia. He and the appellant now reside in California.

Over the years, the appellant has had extensive visitation with the children, including lengthy stays by them with her in Germany and in Virginia.

During the children's last visit with the appellant in California, she found her youngest child in the bathroom crying. When asked why he was upset, he told the appellant that he could no longer take beatings from his father.

After questioning the children extensively, the appellant learned that, according to the children, they had been subjected to frequent and excessive corporal punishment, including once when the appellant's daughter was beaten by her father at the drive-in window in a bank in Charleston, West Virginia.

The appellant investigated the children's stories and found that a teller at the drive-in window at the bank had actually reported to the West Virginia Department of Health and Human Services that the appellant's daughter had been beaten in the car by her father while conducting a drive-through banking transaction and that an investigation of the incident had resulted.

After learning this information, the appellant filed a petition in the Circuit Court of Kanawha County for modification of the previous custody award and for custody of the parties' children.

Hearings were conducted following the filing of the petition for modification of custody. During the hearings, Ingrid Schwartz, a child protective service worker for the West Virginia Department of Health and Human Services, and Vanessa Lynn Connor, the bank teller who witnessed the beating at the Charleston bank, testified. The parties' two children also testified *in camera*. Ms. Schwartz testified that she was assigned to investigate the case after the Department received a phone call stating that a woman had witnessed Robert Darrell O. hitting his daughter. She interviewed both children and testified that:

> Basically they both stated that there was an argument in the car. They did not disclose that [Robert Darrell O.] had struck his daughter. And I remember [E.C.O.], the son—I asked him if he had seen [Robert Darrell O.] hit his sister and he said they started arguing and he looked the other way.

On cross-examination, Ms. Schwartz testified that she asked the daughter if her father had hit her, and the daughter replied, "No."

The second witness, Vanessa Lynn Connor, the bank teller who witnessed the beating at the bank, testified that the appellant's former husband had driven to the teller window and that a little girl was in the passenger seat in the front of the vehicle. While conducting a banking transaction, Ms. Connor testified that she looked up and saw the man hitting the little girl. She indicated that the man, whom she could identify from the transaction process, repeatedly hit the little girl with his forearm. She testified:

A. ... And he was hitting her—It was about in the chest area. And he was hitting her repeatedly very hard.

Q. When you say repeatedly, did you see how many times he struck her?

A. I didn't count. I was in so much shock. It was several times.

Q. Did you notice the little girl's reaction?

A. She was crying very hard. When he stopped she had her school books up around her chest like a shield. I have never seen a look of fear like I did on her face. She was terrified.

Ms. Conner then identified the appellant's husband from recognition as the party who did the striking.

In discussing the incident at the bank, the appellant's daughter, who was eleven at the time of the hearing, testified that on the day of the beating at the bank, she had failed to brush her teeth and the father noticed that fact. She stated that "[h]e excessively smacked me on the lower part of the body." When asked if he had done that before, she replied that he had and added that her brother was hit more than she was.

The appellant's daughter also stated that on one occasion, when she was in the second grade, her father hit her fifty to sixty times on the rear and that it had turned black and blue and stayed black and blue for two days. She also said that her father, on occasion, had struck her brother. She testified:

He [her brother] had left his race car out in the rain and when he went to get it Dad got all mad and he smacked [E.C.O.] once, you know, just once or twice and he made him throw it away even though it still worked. He sometimes has a bad temper. He'll yell at us if we spill our milk.

During the hearing, the appellant's daughter further testified that she did not want to live with her father when she went into puberty. She indicated that she had discussed this with her mother, the appellant, but that this was her own idea, not her mother's idea.

The appellant's son, who was nine at the time of the hearing, testified that he had always wanted to live with his mother and did not know how he had come to live with his father. Relating to his reason for wanting to live with his mother, the appellant's son testified:

A. The reason why—Some of the reason I want to live with Mom is I'm tired of being slapped.

Q. Oh. Did he slap you?

A. Yes. He slapped me several times.

Q. When did he slap you?

A. So many times I can't remember.

Q. Does he get mad?

A. Yes. He gets mad very easily and he drinks quite a bit.

Q. He does?

A. He drinks coke with wine in it, or he has two or three beers.

He further testified:

Q. You don't think you would get—If you come back to stay with your father for a while, you don't think you would change your mind?

A. No.

Q. Why not?

A. Because I'm sure I want to live with Mom. I thought it over and I'm positive.

Q. What about your sister?

A. Same thing with her.

During the hearings, the appellant's former husband testified:

In the course of my children's life, they have had their hands slapped or their rears slapped for disciplinary reasons. Presently they get yelled at more than I would like to, but they get yelled at and sent to their room, which is really the only functional discipline that they receive now.

He testified that the incident at the bank was the only time either child had been touched during the year. He indicated that in the past when he had spanked the children, he had swatted them three or four times on the rear.

At the conclusion of the first hearing, the family law master entered a temporary order granting custody of the children to the appellant and directing that the parties and the children present themselves to a psychologist.

The parties and the children were interviewed by Jeffrey Harlow, a licensed psychologist, who reported that the appellant's former husband had unresolved feelings about the divorce, which included anger and remorse. He stated that the appellant's husband attempted to deny his anger and frustrated feelings and they increased over time. He then expressed them suddenly. The psychologist concluded that this and his impatience were significant personality weaknesses. He concluded that while the appellant's husband had the personality characteristics to be a parent, his "discipline techniques are inappropriate, inconsistent and ineffective ... His slapping of the children falls within the grey area in regard to physical abuse." On the other hand, Mr. Harlow concluded that the appellant had the cognitive and personality attributes sufficient for her to provide parenting for the two children.

The psychologist noted that the two children wanted to live with their mother, and he indicated that the little girl's verbal intellectual abilities were very superior and that her general intellectual functioning was superior. He also found that the parties' son felt emotionally closer to his mother.

The psychologist found that the appellant's husband's discipline techniques were inappropriate, inconsistent, and ineffective and stated that regardless of the outcome of the custody proceeding, he should be required to receive instruction and guidance in effective disciplinary procedures.

During the hearings, two witnesses for the appellant's former husband testified. One was a close neighbor, who generally described the appellant's husband as a good father who participated regularly in the schooling and extracurricular activities of his children. The other witness was the appellant's mother, who testified that the appellant's former husband had permitted her to spend a lot of time with the children and she testified generally that the appellant's former husband was a good father who allowed the children liberal visitation with their maternal grandparents.

At the conclusion of the hearings, the family law master, on October 5, 1993, issued a recommended order in which he recommended that custody of the children be changed from the appellant's husband to the appellant. The family law master found that:

> Dr. Harlow's report indicates that the bank teller's and children's version of the bank incident is closer to the truth than that of the plaintiff, who is apparently denying Dr. Harlow's interpretation that plaintiff seems to be over-emotional at times. Dr. Harlow did not make a recommendation as to custody, but did strongly recommend that plaintiff be required to receive instruction and guidance in effective disciplinary procedures.

The master also found that "these children have clearly expressed a preference for living with their mother ... and have given good reasons for changing custody," and he noted that the daughter gave as one reason for wanting to reside with her mother that she was entering puberty and felt she would be more comfortable with her mother during this period in her life.

The appellant's former husband filed exceptions to the recommendation of the family law master, and a hearing on the exceptions was held before the Circuit Court of Kanawha County.

At the conclusion of the hearing, the circuit court rejected the recommendation of the family law master and refused to modify the previous custody arrangement entered into by the parties and adopted by the court. The court stated:

> This Court does not feel that good reasons have been presented to justify a change in custody nor does it feel that there has been a showing of significant change in circumstances to warrant such a change. The mere fact that 11 and 9 year old children express a desire to live with the non-custodial parent, particularly after a lengthy stay with that parent, is not and never has been sufficient grounds to warrant a change in custody.

The court accordingly denied the appellant's petition for a change of custody, but did order the appellant's former husband to attend parenting classes and counselling to assist him in maintaining control of his anger.

On appeal, the appellant claims that the circuit court erred in failing to follow the family law master's recommendation regarding change of custody.

■ In *Higginbotham v. Higginbotham*, 189 W.Va. 519, 432 S.E.2d 789 (1993), this Court indicated that there were limitations on a circuit court's authority to depart from a family law master's recommendation in a domestic relations case. In syllabus point 1 of *Higginbotham*, the Court stated:

W.Va.Code, 48A–4–10(c) (1990), limits a circuit judge's ability to overturn a family law master's findings and conclusions unless they fall within one of the six enumerated statutory criteria contained in this section. Moreover, Rule 52(a) of the West Virginia Rules of Civil Procedure requires a circuit court which changes a family law master's recommendation to make known its factual findings and conclusions of law.

The six criteria which authorize a circuit court to depart from a family law master's recommendations are set forth in W.Va.Code, 48A–4–20, as follows:

The circuit court shall not follow the recommendation, findings and conclusions of a master found to be: (1) Arbitrary, capricious, an abuse of discretion or otherwise not in conformance with the law; (2) Contrary to constitutional right, power, privilege or immunity; (3) In excess of statutory jurisdiction, authority or limitations or short of statutory right; (4) Without observance of procedure required by law; (5) Unsupported by substantial evidence; or (6) Unwarranted by the facts.

In the present case, the court did not find that the family law master's decision was arbitrary, capricious, or not in conformance with the law or contrary to constitutional right, power, privilege, or immunity, or in excess of statutory jurisdiction, or entered without observance of procedure required by law. Essentially, it appears that the circuit court found that the family law master's conclusion was unsupported by substantial evidence or unwarranted by the facts.

■ The fundamental rule to be applied in determining whether the evidence or facts in a case justify a change in child custody is set forth in syllabus point 2 of *Cloud v. Cloud*, 161 W.Va. 45, 239 S.E.2d 669 (1977), as follows:

To justify a change of child custody, in addition to a change in circumstances of the parties, it must be shown that such change would materially promote the welfare of the child.

■ In the present case, it appears that the trial court concluded that the family law master's recommendation of a change in custody was predicated solely upon the family law master's finding that the children had expressed a preference to live with the appellant rather than with their father.

A close examination of the family law master's findings shows that, while indicating that the master did consider the children's preferences, the master also considered the evidence relating to the striking of the parties' child in the presence of the bank teller. The master found that the psychologist indicated that the children's version of the bank incident was closer to the truth than that of their father. The family law master also found that the psychologist indicated that the children's father was over-emotional at times and that he required instruction and guidance in effective disciplinary procedures.

This Court has recognized that physical abuse of a child by a parent may properly serve as a ground for transfer of custody of a child. *See Rozas v. Rozas*, 176 W.Va. 235, 342 S.E.2d 201 (1986), and *State ex rel. Kiger v. Hancock*, 153 W.Va. 404, 168 S.E.2d 798 (1969). While the striking of the child involved in the present case did not rise to the level of abuse, it was characterized by the psychologist as being in the grey area of abuse.

Further, in the present case, the children did express a clear preference for living with their mother. It is apparent that the children are very intelligent, and it appears that they did, in a thoughtful manner, consider and weigh various factors in arriving at their decisions relating to custodial preference. Their decisions apparently were not based only on the appellant's husband's approach to discipline or on single incidents, but on various factors.

In a number of cases, this Court has discussed the impact of a child's preference on the question of which parent should have custody of the child. On the one hand, the Court has indicated that "... [A]n adolescent fourteen years of age or older ... has an absolute right under *W.Va.Code*, 44–10–4 [1923] to nominate his own guardian." Syllabus point 7, *Garska v. McCoy*, 167 W.Va. 59, 278 S.E.2d 357 (1981). On the other hand, the Court has recognized that children under six years of age usually cannot articulate an intelligent opinion about their custody and, obviously, the preferences of such children should be given little weight. *See, David M. v. Margaret M.*, 182 W.Va. 57, 385 S.E.2d 912 (1989); *J.B. v. A.B.*, 161 W.Va. 332, 242 S.E.2d 248 (1978). In between the two extremes, the Court has suggested that if the children can articulate preferences and explain their preferences, their preferences should be accorded some weight. *See, David M. v. Margaret M., supra.*

In view of all this, the Court believes that the expressions of preference of the children in the present case should be entitled to some weight.

Overall, in this Court's view, a fair reading of the evidence suggests that the family law master's recommendation was supported by clear findings of fact and conclusions of law based on facts which, under the decisions of this Court, would justify a change of custody.

Given the conclusion that the family law master's decision was based on facts and findings that would support a change of custody, and given the fact that the circuit court failed to find that the family law master's decision was inappropriate under any of the other circumstances discussed in W.Va.Code, 48A–4–20, this Court believes that the circuit court erred in reversing the family law master's decision and in failing to transfer custody of the infant children in this case to the appellant.

From the human perspective, this is a very difficult case, and we do not reach this conclusion lightly. This father has done the lion's share of parenting over the last five years of these children's lives. The record indicates that they are intelligent, active children and that their father has been extremely dedicated to them.

The Court notes that the appellee has been a caring father and that, except for his problems relating to the disciplining of the children, he apparently has taken excellent care of them. Also, it appears that he has sought, and seriously engaged in, counselling to modify his attitude and approach to discipline. Somewhat similarly, the children have indicated that they are emotionally attached to him.

■ This Court has recognized that a change of custody is a traumatic event for minor children, and it likewise recognizes that it can be a traumatic event for parents. For instance, in syllabus point 3 of *James M. v. Maynard*, 185 W.Va. 648, 408 S.E.2d 400 (1991), the Court stated:

It is a traumatic experience for children to undergo sudden and dramatic changes in their permanent custodians. Lower courts in cases such as these should provide, whenever possible, for a gradual transition period, especially where young children are involved. Further, such gradual transition periods should be developed in a manner intended to foster the emotional adjustment of the children to this change and to maintain as much stability as possible in their lives.

*See also, Honaker v. Burnside*, 182 W.Va. 448, 388 S.E.2d 322 (1989).

While this Court adheres to the principle that the welfare of the child is the paramount consideration, the Court also believes that a change in custody should, where possible and where consistent with the welfare and best interests of the children, be undertaken in a manner to lessen parental trauma and to facilitate stability in the children's lives.

■ In the present case, where it is evident that both parents care deeply for the children, and the children care deeply for both parents, and where the children are currently receiving proper and good care and are in the middle of their school year, where they are doing quite well in school and in extracurricular activities, the Court believes that the actual transfer of custody should be

postponed until the end of the present school year.

The judgment of the Circuit Court of Kanawha County is, therefore, reversed, and this case is remanded with directions that the circuit court modify the previous custody order and grant custody of the children to the appellant in the manner consistent with the principles stated in this opinion.[1]

Reversed and remanded with directions.

BROTHERTON, J., did not participate.

MILLER, Retired Justice, sitting by temporary assignment.

---

1. It appears that the change of custody in this case will require that the circuit court address the question of child support. The circuit court is, therefore, authorized and directed to take such action on remand as is reasonably necessary to provide for adequate financial support for the children.