455 S.E.2d 553

**Pamela J. DONOHEW, Plaintiff Below, Appellant,**

v.

**Stephen E. DONOHEW, Defendant Below, Appellee.**

No. 22289.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 11, 1995.

Decided Feb. 17, 1995.

David M. Finnerin, Parkersburg, for appellant.

Susan D. Simmons, Elizabeth, for appellee.

PER CURIAM:

Pamela J. Donohew appeals from an order of the Circuit Court of Jackson County transferring custody of her two children to her ex-husband, Stephen E. Donohew. On appeal, Mrs. Donohew claims that the circuit court erred in altering the family law master's (FLM's) recommendation that the children remain with her. We agree, and for the reasons discussed below, we now reverse.

## I.

Prior to September 17, 1991, Mr. and Mrs. Donohew resided as husband and wife in Jackson County, West Virginia. There were two children born of this marriage, Joshua Ryan Donohew (April 6, 1985) and Jeremy Ross Donohew (September 10, 1988). The parties were separated on September 17, 1991, and Mrs. Donohew moved with the children to Ravenswood. On January 13, 1992, the circuit court awarded the parties an absolute divorce. The court specifically found that Mrs. Donohew had "been the primary caretaker of the infant children and ... [was] a fit and proper person to have the permanent and exclusive care, custody and control of the infant children...." Based on this finding, the court awarded custody of the children to Mrs. Donohew. Mr. Donohew was ordered to pay $115.00 in child support every two weeks.

On July 14, 1992, Mr. Donohew filed a verified petition seeking a change of custody. Mr. Donohew asserted that Joshua had lived with him continuously from October 1991 through June 1992. He also alleged that Jeremy had been living with him from March 1992 through June 1992. The FLM held hearings on the matter in November and December 1992.

The transcript of the hearing illustrates the parties' marked disagreement about what transpired between the date of the divorce and June 1992. For instance, Mr. Donohew stated that he and his ex-wife entered an agreement around the time of the divorce that while Mrs. Donohew would have legal custody of both children, Mr. Donohew would raise Joshua. As noted above, he claimed that Joshua lived with him from October 1991 until June 1992 and Jeremy from March 1992 until June 1992.

Mrs. Donohew tells a different story. She stated that she took the children with her after the separation. Then, in approximately October 1991, she asserted that Mr. Donohew "came over one day, just abruptly, barged right in, and he started on me and we got into an argument and I just told him to leave." She stated that Mr. Donohew grabbed both boys and ordered them into his car and left. Mrs. Donohew then retained an attorney who told her to maintain the status quo until the divorce hearing could be held to resolve the matter. Such a hearing was held on November 21, 1991, and Mrs. Donohew was awarded custody.

Mrs. Donohew testified that after she took custody of the children in November, rather than traumatize Joshua by moving him to another school nearer to her new home, (1) she drove him to his old school in the morning, (2) he would then ride the bus to his father's home (the former marital domicile) after school, and (3) she would go to her ex-husband's house every evening to retrieve the child.[1]

She stated that the children continued to live with her from November until March 1992. In March 1992, however, Mrs. Donohew stated that her ex-husband (1) arrived at her home; (2) tried to get her to come back to him; (3) picked her up and threw her on the floor; and (4) grabbed, shook, punched and threatened her. She stated that Mr. Donohew then left with the children. When she drove to her ex-husband's residence to retrieve the children, Mrs. Donohew asserts that Mr. Donohew stayed on the porch and taunted her. Feeling helpless, she left without the children.

Mrs. Donohew explained that she did not learn of the possibility of retrieving the children with the assistance of law enforcement personnel until she had a discussion with a magistrate in May 1992.[2] On June 23, 1992,

---

1. Mrs. Donohew did state that between the time she was awarded custody in 1991 until March 1992, she allowed Joshua to stay with his father during some weekdays. She gave at least two reasons for this arrangement: (1) Mr. Donohew had threatened suicide and told her he would not have suicidal thoughts if someone was there with him; and (2) the harsh winter and her admittedly poor driving skills sometimes made the overnight stays necessary. There is a letter in the record which tends to support at least the first-mentioned assertion. The letter is from Mr. Donohew to his ex-wife, and while its date is unclear, it states in part that "[i]ts [sic] not your fault. Don't tell any body it was suicide or the insurance won't pay off."

2. Mrs. Donohew apparently went to the magistrate to seek redress for two incidents: (1) the alleged beating she received in March 1992; and

Mrs. Donohew, in the company of a deputy sheriff, arrived at her ex-husband's residence. After an emotional confrontation, she removed the children.[3]

Another dispute concerned certain abuse allegedly inflicted upon Mrs. Donohew by her ex-husband. Mr. Donohew testified that he never hit Mrs. Donohew. Mrs. Donohew, however, stated that one morning when she brought a bicycle to her ex-husband's home for Joshua, Mr. Donohew pinned her on the floor and tried to choke her. She also testified to the physical violence discussed above.

Mr. Donohew further suggested that he never did anything which might interfere with his ex-wife's visitation of the children while they resided at his home. Mrs. Donohew, however, stated that Jeremy told her during one visitation that "we aren't allowed to talk to you. We're supposed to ignore you." Mrs. Donohew also said that when she went to see the children her ex-husband would often "start fights with ... [her] and ... paw[ ] ... [her]...." She stated that while she had sexual relations with her ex-husband in January 1992, she did this only because "if ... [she] ever refused to do that, then that's when he threw ... [her] in [sic] the floor, threw ... [her] down and sat on ... [her] and scream[ed] in ... [her] face...."

At the conclusion of the hearing, the FLM announced her decision. She ruled, *inter alia,* as follows:

Although one of the children or both of them may have stayed with Mr. Donohew for awhile, they were legally in their mother's custody at all times since the divorce was final.

. . . .

I think the law's real clear here that the facts don't support a substantial change of circumstances. You folks have kind of been ignoring paperwork and ignoring what the law is and kind of doing things your own way.... What I'm telling you is, you just haven't met your burden of proving that the children—that there's been a change of circumstances or that the children would be materially better off living with their dad. In fact, the evidence is pretty much to the contrary. Josh's teachers [sic] letters, which was [sic] admitted into evidence, along with the evidence of his counselor, is that he's doing real well at ... [the school near his mother's home]. And has adjusted well, is happy.... The counselor's notes make clear that this child is happy with his mom.

This ruling was later preserved in a recommended decision which was served on the parties on February 4, 1993. In her recommended decision, the FLM found, *inter alia,* that "the children have adjusted well to their new school and domicile." Based on this, as well as other "facts surrounding this case," the FLM concluded that a change of custody was inappropriate. Accordingly, Mr. Donohew's petition for modification was denied.

On February 10, 1993, Mr. Donohew filed a petition for review of the FLM's recommended decision. He principally argued that there was a change of circumstances because the residence of the children had changed for a substantial period of time. The circuit

(2) her ex-husband's admitted removal of parts from her car in May 1992. The State agreed to dismiss these charges against Mr. Donohew when he agreed to a 60-day "improvement period." During this time, he promised "not to harass, verbally or physically, nor inflict any harm to the person or property of Pamela J. Donohew or her family."

In addition to her perceived helplessness, Mrs. Donohew provided another reason for not trying to retrieve her children earlier. She stated "I didn't give him permission. He took them that day and I just let them stay up there until I was able to get them back. All because Josh had had so much happen to him that year...." She stated, for instance, that had she retrieved Josh-ua earlier, she would have been required to enroll him in a school nearer to her home because the bus/pick-up arrangement discussed previously herein would have required her ex-husband's involvement and cooperation. In her words "I was thinking of ... [Josh] and his school year."

3. Mrs. Donohew did not dispute that the children were upset when she took them with her. She asserted that her ex-husband began crying, which in turn caused her sons to begin crying. She conceded that she spanked Joshua one time in order to get him to "[s]traighten up[ ]" when he continued to be uncooperative and belligerent. She also stated, however, that the boys were fine a short time thereafter.

court originally entered Mr. Donohew's proposed findings of fact and conclusions of law on July 19, 1993. The circuit court apparently entered these proposed findings and conclusions without hearing argument, additional evidence, or even reviewing the transcript of the hearing before the FLM. After Mrs. Donohew moved for relief from the judgment order, however, the circuit court set aside its prior determination on August 2, 1993.

On August 30, 1993, the parties appeared before the court for argument, and on February 18, 1994, the circuit court announced its decision, contrary to the FLM's recommendation, that custody would be changed to Mr. Donohew. The circuit court entered an order reflecting its decision on March 15, 1994. In that order, the circuit court made the following findings:

1. The parties, after the order of the Court containing custody provisions, on their own and without the Court's approval, made changes in the custody arrangements;

2. Joshua Donohew resided with his father, Stephen E. Donohew, the defendant, from about 1 October 1991 until 23 June 1992; ...

3. On 23 June 1992, Pamela J. Donohew, the plaintiff, arrived at the defendant's home situate at 206 Longview Road, Evans, West Virginia, with a Deputy Sheriff and by force (exerted by her) took physical custody of the children. Stephen Donohew did not interfere. Pamela spanked and dragged the two children to her car, one at a time;

4. There was a de facto change of custody, a change agreed to by the mother;

5. The children had been living with their father for a substantial period of time, and Joshua was enrolled in and going to the school he preferred, i.e. Evans Elementary School, Evans, West Virginia;

6. A material change in circumstances had occurred prior to 23 June 1992; and

7. It is in the best interests of the children, and would materially promote the welfare of the children, to be in the custody of their father, Stephen Donohew, with their mother, Pamela Donohew having liberal visitation....

We granted Mrs. Donohew's petition for appeal, and for the reasons set forth below, we now reverse. The principal issue on appeal concerns whether the circuit court's decision contravenes West Virginia Code § 48A–4–20(c) (Supp.1994).

## II.

The applicable law in this case is well-settled. As we stated in syllabus point 2 of *Cloud v. Cloud,* 161 W.Va. 45, 239 S.E.2d 669 (1977), "To justify a change of child custody, in addition to a change in circumstances of the parties, it must be shown that such change would materially promote the welfare of the child." When reviewing an FLM's recommendation concerning a change of custody, however, the circuit court does not apply the *Cloud* standard in a vacuum.

As we restated last term, "this Court [has] indicated that there ... [are] limitations on a circuit court's authority to depart from a family law master's recommendation in a domestic relations case." *Robert Darrell O. v. Theresa Ann O.,* 192 W.Va. 461, 466, 452 S.E.2d 919, 924 (1994). Moreover, we have specifically determined that an "FLM's findings and conclusions must fall within one of the ... [six criteria in § 48A–4–20(c) ][4] before they could be overturned by the circuit court." *Feaster v. Feaster,* 192 W.Va. 337, 339, 452 S.E.2d 428, 430 (1994); *Odle v. Eastman,* 192 W.Va. 615, 619, 453 S.E.2d 598, 602 (1994) (stating that "[w]hen a circuit judge desires to alter the conclusions and findings of a family law master's recommended order, it must do so under the con-

---

**4.** According to § 48A–4–20(c), a circuit court would be justified in overturning an FLM's findings and conclusions only where they are found to be:

(1) Arbitrary, capricious, an abuse of discretion or otherwise not in conformance with the law; (2) Contrary to constitutional right, power, privilege or immunity; (3) In excess of statutory jurisdiction, authority or limitations or short of statutory right; (4) Without observance of procedure required by law; (5) Unsupported by substantial evidence; or (6) Unwarranted by the facts.

W.Va.Code § 48A–4–20(c).

straints of W.Va.Code, 48A–4–20(c) [1993]"). We also suggested in *Feaster* that a circuit court must "specify which one of the six statutory criteria warranted the change in the FLM's conclusions." *Feaster*, 192 W.Va. at 340, 452 S.E.2d at 431.

■ All of these observations from last term arise from syllabus point one of *Higginbotham v. Higginbotham*, 189 W.Va. 519, 432 S.E.2d 789 (1993), where we stated as follows:

> W.Va. Code, 48A–4–10(c) (1990) [now § 48A–4–20(c)], limits a circuit judge's ability to overturn a family law master's findings and conclusions unless they fall within one of the six enumerated statutory criteria contained in this section. Moreover, Rule 52(a) of the West Virginia Rules of Civil Procedure requires a circuit court which changes a family law master's recommendation to make known its factual findings and conclusions of law.

*Id.* at 520, 432 S.E.2d at 790.

In its March 15, 1994, order awarding custody to Mr. Donohew, the circuit court failed to identify which, if any, grounds under § 48A–4–20(c) justified its disregard of the FLM's recommendation.[5] Aside from that, however, and as illustrated above, there were numerous conflicts in the evidence which called for credibility determinations. The FLM was in the best position to judge the parties' demeanor and to make these difficult determinations. Based on this, as well as our independent review of the record, we conclude that the FLM's findings and conclusions were not subject to reversal under § 48A–4–20(c). We agree with the FLM that Mr. Donohew simply failed to satisfy the *Cloud* standard.

Indeed, it is the circuit court's findings which appear to be deficient in some respects. For instance, the circuit court found

that "Joshua Donohew resided with his father, Stephen E. Donohew, the defendant, from about 1 October 1991 until 23 June 1992." This appears to be based on Mr. Donohew's testimony that Joshua was living with him in October 1991. Mr. Donohew further stated that Joshua was living with him as of the date of the final divorce hearing on December 17, 1991. In a prior filing with the court, however, he said that "*[d]uring the divorce proceeding*, the parties agreed to allow ... [Joshua] to remain a student at Evans Elementary School, *although he lived with his mother in Ravenswood.*" (Emphasis added). The "divorce proceeding" presumably encompasses the period from when Mrs. Donohew filed the divorce action (November 13, 1991) until the date of the formal divorce decree (January 13, 1992). This clear contradiction in the record obviously cuts against the circuit court's finding on this issue.

Neither do we find any of Mr. Donohew's arguments on appeal particularly compelling. Those arguments are largely conclusory and rely primarily on the testimony of Mr. Donohew himself, which was directly countered by that of Mrs. Donohew. There are also contradictions present in some of Mr. Donohew's proffered arguments. For instance, Mr. Donohew's states in his responsive brief that "[t]he testimony regarding Mr. Donohew's refusing to accept the divorce lived only in Mrs. Donohew's imagination. There was nothing to substantiate her claims that this occurred." One need look no further than Mr. Donohew's own testimony though, to substantiate his ex-wife's statements on this issue. Mr. Donohew testified as follows at the hearing before the FLM:

> Q. Okay. Let me back you up a little bit. When you said you'd talked to Pamela to try to work things out, what were you trying to work out at that time?

---

5. In its July 19, 1993, order (which in reality was a proposed order submitted by counsel for Mr. Donohew) the circuit court stated that the FLM's decision was "unwarranted by the facts." This order, however, was set aside on August 5, 1993, and no similar language appears in the final order of March 15, 1994. The circuit court's informal letter to the parties on February 18,

1994, did state that a portion of the FLM's decision "was clearly wrong." The words "clearly wrong," however, do not appear in § 48A–4–20(c) and are thus not cognizable grounds for modification. Further, the circuit court, again, inexplicably omitted this finding from its March 15, 1994, final order.

A. *I was trying to get her to come home.*

Q. So you were trying to get her—to reconcile with her?

A. *I've always tried to do that.* (Emphasis added).

Rather than basing its decision on some cognizable ground under § 48A–4–20(c), it is plain that the circuit court chose to "improperly substitute[ ] its [own] judgment over that of the FLM's recommendation without specifying how the FLM's findings and conclusions were deficient." *Feaster*, 192 W.Va. at 340, 452 S.E.2d at 431. In doing so, the circuit court erred. Based on the foregoing, the decision of the Circuit Court of Jackson County is hereby reversed.

Reversed.

BROTHERTON, J., did not participate.

FOX, J., sitting by temporary assignment.