476 S.E.2d 213

**SANDRA M., Plaintiff Below, Appellant,**

v.

**JEREMY M., Defendant Below, Appellee.**

**No. 23185.**

Supreme Court of Appeals of
West Virginia.

Submitted April 24, 1996.

Decided July 17, 1996.

the Court determined that a rule to show cause should not be awarded and refused to award the requested writ.

Maureen Conley, Charleston, for Plaintiff Below, Appellant.

Deborah E. Reed, Charleston, for Defendant Below, Appellee.

PER CURIAM.

This is an appeal by Sandra M.[1] (hereinafter "Appellant" or "mother") from an October 4, 1995, order of the Circuit Court of Kanawha County denying jurisdiction in the state of West Virginia and ordering full faith and credit to a Florida decree granting custody of the Appellant's son to her former husband, Appellee Jeremy M. (hereinafter "Appellee" or "father"). The Appellant contends that pursuant to the Uniform Child Custody Jurisdiction Act (hereinafter "UCCJA") and the Parental Kidnapping Prevention Act (hereinafter "PKPA"), jurisdiction of this child custody matter properly lies in West Virginia. We affirm the decision of the lower court with regard to the appropriateness of jurisdiction in Florida, but specifically recognize the right of the lower court to entertain a motion for modification of the Florida decree.

I.

Bryan M. was born on May 7, 1993, in California and resided with his parents in that state until approximately July 1, 1994. The family thereafter relocated to Florida, and the parents separated on July 15, 1994, allegedly due to domestic violence by the Appellee.[2] The Appellant and Bryan moved to West Virginia on August 8, 1994, to reside with the Appellant's relatives. On September 20, 1994, the Appellee filed a divorce and custody action in Florida, and on October 17, 1994, the Appellant filed a custody action in West Virginia.

A hearing was held in Florida on November 9, 1994. The Appellant did not attend the hearing, but she obtained Florida counsel to attend the hearing and challenge Florida's jurisdiction on the custody issue. A final divorce order was entered in Florida on November 15, 1994, granting temporary custody

---

1. We follow our traditional practice of protecting the identities of the parties in cases involving sensitive facts. *See In re Jonathan Michael D.*, 194 W.Va. 20, 459 S.E.2d 131 (1995); *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994).

2. Although the Appellant filed a proceeding for protection from the Appellee in Florida, she later allowed the matter to lapse when she moved out of the state.

to the father and allowing the Appellant twenty days to contest that determination. The Appellant timely filed a petition in Florida to contest the Florida custody decision and also filed a motion in West Virginia to permit the lower court to enter into communication with the Florida court. Although no written order commemorating the conversation was entered, Judge Lyne Ranson of the Circuit Court of Kanawha County apparently spoke by telephone on or about December 2, 1994, to Judge Hale Stancil of the Florida court.[3]

On December 12, 1994, the father filed a motion to dismiss the West Virginia action on the basis of jurisdiction being appropriately assumed in Florida. The motion was apparently not ruled upon, and a family law master in West Virginia conducted a hearing regarding custody on January 4, 1995. The West Virginia family law master granted custody to the mother, pending a ruling on the issue of jurisdiction. On August 23, 1995, the Florida court conducted a hearing in which both parties, each represented by counsel, participated. The Florida court granted custody to the father subsequent to that hearing.

On August 25, 1995, the father visited the child for the first time since the July 1994 separation.[4] On August 31, 1995, both parties attended a hearing in the Circuit Court of Kanawha County, and the Appellant's request for a stay of the Florida decree was granted. Custody therefore remained with the Appellant in West Virginia with visitation to the father. On October 4, 1995, the lower court denied jurisdiction in West Virginia and ordered full faith and credit to the Florida decree granting custody to the father. Custody of the child has remained in West Virginia pending resolution of this appeal.

## II.

■ Interstate child visitation and custody disputes are governed by two statutory

schemes, the PKPA, 28 U.S.C. § 1738A (1994), and the UCCJA, West Virginia Code § 48–10–1, et seq. (1995).[5] The PKPA requires every state to recognize and enforce custody determinations of sister states that are consistent with the Act, providing as follows at 28 U.S.C. § 1738A(a):

> The appropriate authorities of every State shall enforce according to its terms, and shall not modify except as provided in subsection (f) of this section, any child custody determination made consistently with the provisions of this section by a court of another State.

Likewise, as we explained in *Arbogast v. Arbogast*, 174 W.Va. 498, 327 S.E.2d 675 (1984), the UCCJA "provides that foreign states' custody decrees are to be recognized and enforced by West Virginia courts if they accord with statutory provisions substantially similar to those of the UCCJA or meet UCCJA jurisdictional standards." 174 W.Va. at 502, 327 S.E.2d at 679. In *Arbogast*, we noted that both the PKPA and UCCJA attempt "to eliminate judicial competition and conflicting decrees in interstate child custody dispute by establishing clear and definite rules about which state has jurisdiction of a custody dispute and enforcing orders of that state." *Id.*

A court is authorized to assume jurisdiction over a child custody matter by initial or modification decree under section 48–10–3 of the UCCJA if:

> (1) This State (i) is the home state of the child at the time of commencement of the proceeding or (ii) has been the child's home state within six months before commencement of the proceeding, the child is absent from this State because of his removal or retention by a person claiming his custody or for other reasons and a

---

**3.** Judge Stancil of the Florida court, subsequent to his conversation with Judge Ranson, apparently made a notation indicating that West Virginia would surrender jurisdiction.

**4.** No child support had been ordered, and the father had not made any financial contribution to the support of the child since the separation.

Several cards and gifts, however, had been sent by the father.

**5.** At the outset of this examination we note that the UCCJA adopted by Florida has jurisdictional prerequisites identical to those set forth in W.Va. Code § 48–10–3. *See* Fla.Stat.Ann. § 61.1308 (West 1985).

parent or person acting as parent continues to live in this State; or

(2) It is in the best interest of the child that a court of this State assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection with this State, and (ii) there is available in this State substantial evidence concerning the child's present or future care, protection, training and personal relationships; or

(3) The child is physically present in this State, and (i) the child has been abandoned, or (ii) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent; or

(4)(i) It appears that no other state would have jurisdiction under prerequisites substantially in accordance with subdivision (1), (2) or (3) of this subsection, or another state has declined to exercise jurisdiction on the ground that this State is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that this court assume jurisdiction. . . .

■ We have also specifically acknowledged that the UCCJA is not the only statutory scheme applicable to interstate custody disputes in West Virginia; the PKPA must also be consulted. *Sheila L. v. Ronald P.M.*, 195 W.Va. 210, 465 S.E.2d 210, 218 (1995). The applicable language of the PKPA, 28 U.S.C. § 1738A(c), (d), and (g), provides as follows:

(c) A child custody determination made by a court of a State is consistent with the provisions of this section only if—

(1) such court has jurisdiction under the law of such State; and

(2) one of the following conditions is met:

(A) such State (i) is the home State of the child on the date of the commencement of the proceeding, or (ii) had been the child's home State within six months before the date of the commencement of the proceeding and the child is absent from such State because of his removal or retention by a contestant or for other reasons, and a contestant continues to live in such State;

(B)(i) it appears that no other State would have jurisdiction under subparagraph (A), and (ii) it is in the best interest of the child that a court of such State assume jurisdiction because (I) the child and his parents, or the child and at least one contestant, have a significant connection with such State other than mere physical presence in such State, and (II) there is available in such State substantial evidence concerning the child's present or future care, protection, training, and personal relationships;

(C) the child is physically present in such State and (i) the child has been abandoned, or (ii) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse;

(D)(i) it appears that no other State would have jurisdiction under subparagraph (A), (B), (C), or (E), or another State has declined to exercise jurisdiction on the ground that the State whose jurisdiction is in issue is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that such court assume jurisdiction; or

(E) the court has continuing jurisdiction pursuant to subsection (d) of this section.

(d) The jurisdiction of a court of a State which has made a child custody determination consistently with the provisions of this section continues as long as the requirement of subsection (c)(1) of this section continues to be met and such State remains the residence of the child or of any contestant.

\*      \*      \*      \*      \*      \*

(g) A court of a State shall not exercise jurisdiction in any proceeding for a custody determination commenced during the pendency of a proceeding in a court of another State where such court of that other State is exercising jurisdiction consistently with the provisions of this section to make a custody determination.

One significant difference between the PKPA and the UCCJA is that the PKPA gives distinct priority to the "home state" jurisdiction of a child over another state that may have a "significant connection" to the child or have "substantial evidence" with regard to "the child's present or future care, protection, training, and personal relationships[.]" 28 U.S.C. § 1738A(c)(2)(A) and (B).[6] Such a priority is not granted to the "home state" under the UCCJA.[7]

We recognized this preference in *Sams v. Boston,* 181 W.Va. 706, 384 S.E.2d 151 (1989), as follows:

[T]he Federal PKP Act gives a distinct priority to the state court exercising "home-state" jurisdiction to enter an initial custody decree [over a state that bases its jurisdiction on a "significant connection" and "substantial evidence" test. 28 U.S.C. Sec. 1738A(c)(2)(A) and (B) ]. Therefore, the Federal PKP Act makes it judicially imprudent for a state court in one state to exercise jurisdiction to enter an initial custody decree when a state court in another state has 'home-state' jurisdiction and has not declined to exercise that jurisdiction; if conflicting decrees were issued, only the custody decree of the 'home-state' court would be entitled to full faith and credit under the Federal PKP Act. *Mancusi v. Mancusi,* 136 Misc.2d 898, 901–04, 519 N.Y.S.2d 476, 478–79 (Fam.Ct.1987).

181 W.Va. at 712, 384 S.E.2d at 157.

In *Sheila L.,* we recognized that the full faith and credit doctrine will not be applied where a foreign court lacked jurisdiction under the UCCJA and the PKPA.[8] 195 W.Va. at 217, 465 S.E.2d at 217. In syllabus point one of *Sheila L.,* we stated:

"The Parental Kidnapping Prevention Act of 1980, 28 U.S.C. § 1738A (1982), extends full faith and credit principles to child custody decrees and requires every state to enforce sister state custody determinations that are consistent with the act." Syllabus Point 1, *Arbogast v. Arbogast,* 174 W.Va. 498, 327 S.E.2d 675 (1984).

In syllabus point two of *Sheila L.,* we continued:

Under the Parental Kidnapping Prevention Act of 1980, 28 U.S.C. § 1738A(d), a court may continue its jurisdiction if it has made a child custody determination consistent with the provisions of this section, if it maintains jurisdiction under its law, and if either the child or a contestant continues to reside in the state. A custody determination is defined in 28 U.S.C. § 1738A(b)(3) as a judgment, decree, or other order of a court providing for the custody or visitation of a child, and includes permanent and temporary orders, and initial orders and modifications.

In *Sheila L.,* the mother resided in West Virginia with the son, and the father resided in Ohio. 195 W.Va. at 213, 465 S.E.2d at 213. The child's father obtained temporary custody of the child through the Ohio court based upon allegations of sexual abuse toward the child by the mother's stepfather. *Id.* Ohio then retained jurisdiction, and West Virginia accorded full faith and credit to the Ohio determination of custody to the father. *Id.* at 215, 465 S.E.2d at 215. The mother appealed, and we held that although the Ohio court properly maintained jurisdiction for the purpose of emergency custody under the allegations of abuse, Ohio lacked jurisdiction for determination of the ultimate custody

6. The phrase "home state" is defined identically in the PKPA and the UCCJA as the State in which, immediately preceding the time involved, the child lived with his parents, a parent, or a person acting as parent, for at least six consecutive months.

7. The UCCJA permits "home state" status to justify assumption of jurisdiction, but also permits other states to assume jurisdiction without specifically addressing whether a different state is the "home state." Under the PKPA, jurisdiction based upon a "significant connection," for instance, is authorized only if it appears that no

other state would qualify as the home state. *See* 28 U.S.C. § 1738A(c)(2)(B).

8. The Comment following Section 13 of the model UCCJA explains that states are not necessarily required to recognize and enforce out-of-state custody decrees under the Full Faith and Credit Clause. However, under Section 13 of the UCCJA, it becomes "a matter of state law, that custody decrees of sister states will be recognized and enforced" in those states that adopt the Act so long as the sister state complies with the jurisdictional standards of the Act. 9 U.L.A. 276.

resolution and West Virginia, as the home state, was considered the most appropriate forum for deciding the custody issue. *Id.* at 223, 465 S.E.2d at 223.

## III.

■ Based upon the inclusion of mixed questions of law and fact requiring consideration of legal concepts and statutory construction, our review is plenary. *See Burnside v. Burnside,* 194 W.Va. 263, 265, 460 S.E.2d 264, 266 (1995). The Appellant contends that the lower court improperly yielded to the Florida court because Florida's claim of jurisdiction is inconsistent with the UCCJA. The Appellant argues that Florida failed to satisfy any of the enumerated prerequisites, either in the UCCJA or the PKPA, for assuming jurisdiction. First, Florida was not the "home state" of the child, and in fact there was no true "home state" (with the possible exception of California which is not involved in these proceedings) since the child had not resided in either West Virginia or Florida for a period of six months by the initiation of these proceedings. The child had spent only five weeks in Florida and six weeks in West Virginia. Second, Florida had no particular claim to having a significant connection with the child or having substantial evidence concerning the child. Third, Florida could not have premised jurisdiction on the physical presence of the child in the state because Bryan was not physically present in Florida at the time the proceedings were filed. The fourth method of assuming jurisdiction involves the appearance that no other state would have jurisdiction or has declined to exercise jurisdiction. The Florida court was cognizant of West Virginia's examination of the matter and had discussed the issue with the lower court via telephone in December 1994. No formal order was entered at that time memorializing that conversation, and we are therefore unable to determine with precision whether any final decision regarding jurisdiction was reached at that time. Judge Stancil of Florida did, however, apparently make a notation subsequent to the telephone conversation indicating that West Virginia would surrender jurisdiction. No final order regarding the jurisdiction issue was entered in West Virginia until October 4, 1995. That order declared that West Virginia denied jurisdiction and ordered full faith and credit to the Florida decree.

The Appellant contends that, under the circumstances, the Florida court was not justified in assuming jurisdiction and that its decision was not entitled to full faith and credit in West Virginia. The Appellant maintains that West Virginia is properly vested with jurisdiction over this matter due to the more extensive connections between the child and this state. Bryan resided in California for fourteen months, in Florida for five weeks, and in West Virginia for six weeks prior to the filing of this custody action in Florida. In the absence of a "home state," jurisdiction may be claimed based upon significant connection and evidence, upon physical presence of the child in the state, or upon the lack of jurisdiction in another state or another state's refusal to exercise jurisdiction. It appears, however, that at the time this issue arose neither West Virginia nor Florida qualified as the home state, and neither had significant connections. The circuit court, however, apparently communicated with the Florida court and came to an agreement that Florida should exercise jurisdiction, thus, essentially declining to accept jurisdiction under section 48–10–3(a)(4)(i) of the West Virginia Code (UCCJA).

### IV. Modification

West Virginia Code § 48–10–3 recognizes modification [9] of foreign custody decrees in certain instances and provides as follows:

---

9. The right to modify a foreign custody decree has been recognized by several other courts. *See Kudler v. Smith,* 643 P.2d 783 (Colo.App.1981), *cert. denied,* 459 U.S. 837, 103 S.Ct. 83, 74 L.Ed.2d 78 (1982) (holding that Colorado, as the "home state," had jurisdiction to modify New York custody decree where denial of maternal grandparents' visitation rights deemed in best interests of children); *Gordey v. Graves,* 528 So.2d 1319 (Fla.Dist.Ct.App.1988) (holding that Florida court should have assumed jurisdiction to consider grandparents' petition to modify custody provisions of Nevada divorce decree where Florida was child's "home state" and child's only "significant connection" with Nevada was residence of natural mother whom child had not

(a) A court of this State which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:

. . . . .

(2) It is in the best interest of the child that a court of this State assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection with this State, and (ii) there is available in this State substantial evidence concerning the child's present or future care, protection, training and personal relationships. . . .

▮ In syllabus point two of *In re Brandon L.E.*, 183 W.Va. 113, 394 S.E.2d 515 (1990), we acknowledged that concurrent jurisdiction[10] could exist in matters of child custody and visitation and stated as follows:

Notwithstanding their intent to require states adopting the Uniform Child Custody Jurisdiction Act to recognize custody decrees entered by sister states, the Act's drafters in no uncertain terms provided jurisdiction to both the original "custody court" and other courts to determine whether modification of the initial custody decree is in the best interest of the child.

*See also Escudero v. Henry*, 183 W.Va. 370, 395 S.E.2d 793 (1990). Under section 48–10–15(a) of the UCCJA a second "custody court" has jurisdiction to modify another state's custody decree if:

(1) it appears to the court of this State that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with this article or has declined to assume jurisdiction to modify the decree

and (2) the court of this State has jurisdiction.

The UCCJA "is premised on the theory that the best interests of a child are served by limiting jurisdiction to modify a child custody decree to the court which has the maximum amount of evidence regarding the child's present and future welfare." *Brandon L.E.*, 183 W.Va. at 114, 394 S.E.2d at 516, syl. pt. 1. In *Arbogast*, we concluded that although the child and his mother were currently living in West Virginia, the Kansas court retained jurisdiction over the case by virtue of the child's "significant connection" with Kansas. 174 W.Va. at 503, 327 S.E.2d at 681. The significant connection was established by (1) the initial determination of custody was made in Kansas; (2) the "substantial evidence about the child's welfare available in Kansas;" (3) the father's residence in Kansas and (4) the father's address to the Kansas court of "his complaints about visitation and custody." *Id.*

In *Brandon L. E.*, we held that the best interests of the child were to be considered and that West Virginia, the court with the most substantial evidence regarding the child's present and future well-being, should have jurisdiction. 183 W.Va. at 119, 394 S.E.2d at 521. Significantly, we explained in *Brandon L.E.* that the UCCJA permits a sister state with contacts to the child to determine whether modification of the initial decree is in the best interests of the child and requires that West Virginia, if serving as a modifying court, " 'give due consideration to the transcript of the record and other documents of all previous proceedings submitted to it in accordance with section twenty-two [Sec. 48–10–22] of this article.' W.Va. Code § 48–10–15(b)." 183 W.Va. at 120, 394 S.E.2d at 522. Under section twenty-two of

seen in over four years); *Jennings v. Jennings*, 392 So.2d 962 (Fla.Dist.Ct.App.1980) (holding that Florida court abused its discretion in refusing to exercise jurisdiction to consider father's amended complaint to modify child custody provisions of Idaho divorce decree where complaint contained sufficient allegations of changed circumstances); *Gordon v. Gordon*, 185 Ga.App. 100, 363 S.E.2d 353 (1987) (holding that where jurisdictional requisites of UCCJA were satisfied and there was material change in conditions affecting child's welfare since entry of prior de-

cree, Georgia court had jurisdiction to modify Ohio change of custody decree).

**10.** *See McAtee v. McAtee*, 174 W.Va. 129, 133 n. 2, 323 S.E.2d 611, 615 n. 2 (1984) (noting that although two states may have concurrent jurisdiction to determine child custody, the "home state" and the "significant-connection" state, UCCJA in Sections 6 and 7, W.Va.Code, 48–10–6 and 7 [1981], assures that "only one state will make the custody decision").

the Act, a foreign court would be required to forward to the West Virginia court a certified copy of all documents pertaining to the custody determination upon appropriate request. W.Va.Code § 48–10–22 (1986).

We concluded in *Brandon L.E.* that West Virginia had jurisdiction because of the "substantial evidence concerning the child's present or future care, protection, training and personal relationships." 183 W.Va. at 118, 394 S.E.2d at 520 (quoting W.Va.Code, 48–10–3(a)(2)(ii)). We found that Florida, the state making the initial determination, no longer had jurisdiction and recognized that the residence of a child within a community for six months can generate significant data. *Id.* Brandon was enrolled in a West Virginia school and had been examined by a local psychiatrist, giving the West Virginia court substantial evidence regarding his welfare. *Id.* at 119, 394 S.E.2d at 521.

In the present case, we do not find Florida's initial assumption of jurisdiction to be inconsistent with the UCCJA, based upon the fact that the West Virginia court declined jurisdiction. During the substantial period of irresolution, however, the child has remained with the Appellant and has developed significant contacts with this state as opposed to the state of Florida. The paramount concern in child custody cases must be the welfare of the child. We have consistently emphasized that the best interests of the child are the "guiding force in all custody matters, as well as a recognition that the child has his own individual rights." *Snyder v. Scheerer,* 190 W.Va. 64, 69, 436 S.E.2d 299, 304 (1993). We have also explained that the "child's welfare is the paramount and controlling factor in all custody matters." *David M. v. Margaret M.,* 182 W.Va. 57, 60, 385 S.E.2d 912, 916 (1989). "[A]ll parental rights in child custody matters are subordinate to the interests of the innocent child." *Id.* As we recognized in *West Virginia Dept. of Human Services v. La Rea Ann C. L.,* 175 W.Va. 330, 332 S.E.2d 632 (1985), "[c]hild custody cases certainly should be decided promptly. Regardless of who is responsible for the delay in this case, the child is the unfortunate victim." *Id.* at 337 n. 8, 332 S.E.2d at 638 n. 8.

We explained the following, in an abuse and neglect context, in *In re Carlita B.,* 185 W.Va. 613, 408 S.E.2d 365 (1991):

> The bulk of the most aggravated procedural delays, however, are occasioned less by the complexities of mending broken people and relationships than by the tendency of these types of cases to fall through the cracks in the system. The long procedural delays in this and most other abuse and neglect cases considered by this Court in the last decade indicate that neither the lawyers nor the courts are doing an adequate job of assuring that children—the most voiceless segment of our society—aren't left to languish in a limbo-like state during a time most crucial to their human development.

185 W.Va. at 622, 408 S.E.2d at 374.

In *Sams,* we engaged in a discussion of a custody dispute culminating in opinions from a New York court in 1977 and a New Jersey court in 1979 in which the paramount concern was the welfare of the children. 181 W.Va. at 715, 384 S.E.2d at 160. In *Nehra v. Uhlar,* 43 N.Y.2d 242, 401 N.Y.S.2d 168, 372 N.E.2d 4 (1977), the New York court astutely noted the following:

> This case, like most child custody matters, involves a collision of principles as well as of intransigent would-be custodians of the hapless children, innocent subjects of a conflict they can never understand. The primary principle of the child's best interest is never easily applied once the litigants themselves have succeeded in creating the disruption of shifting custody as has happened in this case. The courts can only repair, patch, and cover over, as best they can, the irreparable harm occasioned and reduce the harm to a minimum, if the minimum is discernible.

*Id.* at 172–73, 372 N.E.2d at 8–9.

In the New Jersey determination (the mother eventually moved to New Jersey and filed the case there), *Nehra v. Uhlar,* 168 N.J.Super. 187, 402 A.2d 264 (App.Div.), *petition for certification denied,* 81 N.J. 413, 408 A.2d 807 (1979), the court concluded that the mere passage of several years during which the children had remained in the physical

custody of the mother justified full inquiry into the best interests of the children. 402 A.2d at 268. Regarding the fact that the children had been removed by their mother, the court explained as follows:

> [T]he welfare of the children is paramount. Their welfare should not be sacrificed on the altar of judicial punishment of a parent for her wrongdoing in removing the children from a foreign jurisdiction, or in violating the order of a foreign court.[11]

*Id.* at 267. The court also noted as follows:

> [T]he paramount issue before the trial court and this court is necessarily the welfare of the children rather than the tactics of their parents. Thus, despite the improprieties of the mother and their impact upon the rights of the father, the court must primarily concern itself with the children and their welfare in this tragic and unfortunate custody struggle.

*Id.* at 268–69 (citations omitted).

It is unfortunate that the failure of the courts below and the lawyers to crystallize the jurisdictional issue in a definitive way and to memorialize the result in a timely order in the case *sub judice* postponed any real resolution in Bryan's life. While we uphold jurisdiction in Florida on the basis that neither West Virginia nor Florida qualified as home state at the time this issue arose, and upon the declination of jurisdiction by our lower court, we find that the passage of time now makes West Virginia an appropriate forum for a modification proceeding should the Appellant choose to bring it.

West Virginia would now be the preferable forum for the proper resolution of the modification of custody issue.[12] It is the state of West Virginia which now has significant evidence necessary to determine the custody resolution most beneficial to the Bryan's welfare. As the New Jersey *Nehra* court concluded,

> [W]hether the delay has resulted from the actions of the mother or father, or from circumstances inherent in protracted litigation, the real problem which transcends all other considerations still exists—namely, whether the removal of the children from their present stable environment will harm them psychologically with an adverse effect upon their future development.

402 A.2d at 268.

Consequently, while we affirm the decision of the lower court with regard to initial jurisdiction, we recognize that West Virginia would have jurisdiction to modify the order of the Florida court upon proper motion by the Appellant. We concomitantly stay the effect of this opinion for thirty days to permit the initiation of such a modification proceeding.[13]

Affirmed.

---

**11.** In the instant case, there is no claim that the mother absconded with the child. We cite this case only for the concept of the welfare of the child being paramount.

**12.** By this ruling, we do not intend to prejudge the issue of an appropriate custody resolution, but we merely recognize the reality that the bulk of the information about Bryan and his life crucial to custody and visitation decisions now does exist primarily in West Virginia. We also reiterate our consistent emphasis on the principle that no matter the eventual outcome of the custody decision, it will be an additional challenge to the lower court in this interstate situation to attempt to ensure a continuous relationship between the child and the non-custodial parent. As we explained in syllabus point nine of *White v. Williamson*, 192 W.Va. 683, 453 S.E.2d 666 (1994), "In considering visitation issues, courts must be

mindful of their obligation to facilitate the right of noncustodial parent to full and fair chance to continue to maintain a close relationship with his or her children." *See also Weber v. Weber*, 193 W.Va. 551, 457 S.E.2d 488 (1995).

**13.** In the event custody of this child is ordered transferred, either as a result of no petition for modification being filed within thirty days or in the event the court hearing the petition to modify makes no interim order of temporary custody pending the resolution of the modification, we emphasize the duty of the lower court to fashion a strategy of gradual transition to ensure the least traumatic relocation of the child. As we previously explained in syllabus point three of *James M. v. Maynard*, 185 W.Va. 648, 408 S.E.2d 400 (1991),

> It is a traumatic experience for children to undergo sudden and dramatic changes in their

permanent custodians. Lower courts in cases such as these should provide, whenever possible, for a gradual transition period, especially where young children are involved. Further, such gradual transition periods should be developed in a manner intended to foster the emotional adjustment of the children to this change and to maintain as much stability as possible in their lives.
See also *Robert Darrell O. v. Theresa Ann O.*, 192 W.Va. 461, 452 S.E.2d 919 (1994); *Honaker v. Burnside*, 182 W.Va. 448, 388 S.E.2d 322 (1989).

Accordingly, the lower court, in the event a change in physical custody is deemed necessary, should direct a gradual transition period for Bryan's relocation to his father. The transition period should provide for increasing amounts of visitation and overnight stays with the father before he obtains full custody. The circuit court should arrange this schedule "in a manner intended to foster the emotional adjustment" of Bryan "while not unduly disrupting the lives of the parties[.]" *Honaker*, 182 W.Va. at 453, 388 S.E.2d at 326. This is a particularly difficult challenge in an interstate situation, and will require sacrifice and inconvenience on the part of both parents if it is successful for Bryan.