475 S.E.2d 540

**Searene Two Feathers ROCK, Petitioner Below, Appellant,**

v.

**Orval Bahe ROCK, Respondent Below, Appellee,**

v.

**WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, Respondent Below, Appellee.**

No. 23064.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 17, 1996.

Decided July 19, 1996.

Timothy M. Sirk, Keyser, for Petitioner Below Appellant.

John G. Ours, Petersburg, for Respondent Below Appellee.

Jane Moran, Williamson, guardian ad litem.

WORKMAN, Justice.

Appellant Searene Rock appeals the dismissal of a petition filed in the Circuit Court of Pendleton County pursuant to the Uniform Child Custody Jurisdiction Act ("UCCJA"), West Virginia Code §§ 48–10–1 to

–26 (1995), challenging a Maryland court order that transferred custody of the parties' daughter, Willow Red Wing, to Appellee Orval Rock. After fully reviewing this matter, we affirm the lower court's determination that Maryland had jurisdiction to render the initial custody determination.

Appellant, the mother of Willow, first initiated the West Virginia proceedings at issue in May 1995. Prior to the commencement of the West Virginia action, however, numerous significant factual and procedural events had transpired while the parties were both living in Maryland. The parties separated in September 1992 [1] and Appellant filed a divorce complaint on November 13, 1992, in the Circuit Court of Anne Arundel County, Maryland (hereinafter the "Maryland court"). The precipitating event for the filing of the divorce complaint was an allegation of sexual abuse made by Willow against her father.[2]

From the beginning of the divorce proceedings, Appellant was awarded the temporary custody of Willow.[3] On April 29, 1993, the Maryland court ordered supervised, therapeutic visitation between Appellee and Willow. Jane Ramon, a licensed, clinical social worker, was appointed to supervise the visitation and provide therapy as needed. On June 2, 1993, Appellant filed a motion to remove Ms. Ramon, stating that she had found her own therapist.[4] By this time, two scheduled visitations had not occurred and Appellee had not seen his daughter for eight months. Out of concern for the mounting visitation problems, the Maryland court appointed lawyer Penelope Dart to represent Willow's interests on June 11, 1993.

Still in the Maryland court system, Appellee moved for specific visitation on July 6, 1993, to which Appellant objected. A four-day evidentiary hearing began on the issue of visitation on August 24, 1993. Evidence was presented by several police officers, case workers, physicians, and lay witnesses concerning the child abuse allegations that had surfaced.[5] By order dated September 15, 1993, the Maryland court again granted Appellee supervised visitation under the direction of Jane Ramon and ordered the parties to submit to psychological examinations.[6]

Ms. Ramon advised the Maryland court on November 6, 1994, that she had concerns that Appellant was not complying with the court's visitation order.[7] Additionally, she

---

1. A previous separation between the parties occurred beginning in the summer of 1988. During a two and one-half year separation, Appellee only saw Willow one hour per week according to a Maryland court order entered on September 15, 1993. Appellee claims that this limited amount of visitation, as well as the restriction that the visitations be supervised by Appellant, were imposed because Appellant "was afraid he would attempt to kidnap Willow."

2. Appellant reported Appellee to the Maryland Department of Social Services ("DSS") on September 28, 1992, alleging that Willow had been sexually abused by her father. Willow, whose date of birth is May 27, 1987, was five years old at the time of the alleged incident. In connection with this report, a family protection order was issued by a Maryland court on November 9, 1992. The case file was closed by the DSS on November 22, 1992, with notations that "Mrs. Rock is able to protect the children and has Willow in counseling" and that the allegation of sexual abuse was "[u]nsubstantiated."

3. The record in this case does not contain an order awarding temporary custody of Willow to Appellant, but numerous other documents refer to such award. For example, in Appellee's motion to dismiss petition for custody, reference is made to the Maryland court's decision in August

of 1993 to incorporate the parties' agreement that Appellant have custody of Willow.

4. The Maryland court, in its September 15, 1993, order, posited that Appellant's dislike of Ms. Ramon stemmed from the conclusion reached by the therapist that "abuse cannot be determined." The court further noted in that same order that "Mrs. Rock doesn't get along with Ms. Ramon (because of her findings in this case). . . ."

5. No transcripts have been provided to this Court.

6. Recognizing that "a new therapist might be helpful[,]" the Maryland court continued therapy with Ms. Ramon due to concern for expenses. The court did, however, direct Appellee to explore the availability of other therapists through his health maintenance organization. The record does not reflect whether Appellee made such inquiries.

7. This letter intimates that the visitation was supposed to be scheduled every other week. This same letter reflects that no order was ever prepared in reference to a June 7, 1994, hearing, which presumably addressed the frequency of Appellee's visitation award.

informed the court that Appellant had moved to West Virginia with Willow during the summer of 1994 without providing notice to anyone. Upon receiving this information, Appellee filed a motion for contempt against Appellant for failing to comply with the court's visitation directives. On December 9, 1994, the Maryland court issued a show cause order concerning the contempt motion and by "Blue Note"[8] of that same date, asked all parties to respond to Ms. Ramon's concerns. By motion dated December 29, 1994, Appellee sought to have Appellant found in contempt of court for failing to permit him to exercise his visitation rights.

Ms. Dart filed a motion for ex parte emergency relief on January 19, 1995, on Willow's behalf. As grounds for her motion, she averred that there had been no visitation since October 4, 1994; that Appellant had a history of successive male roommates; that Willow was not receiving necessary counseling; that truancy was an issue; that Willow was in an unstable environment; that she and Ms. Ramon both believed that Appellee was a fit and proper person to have custody and that it was in Willow's best interests to be placed in Appellee's custody. The Maryland court, through a "Blue Note,"[9] indicated on January 24, 1995, that "an Ex Parte Order, without notice, is [in]appropriate."

Hearings were held on the contempt petition before the Maryland court on January 20 and 26, 1995. Appellant was neither present nor represented by counsel at either of these hearings. On February 7, 1995, the court found Appellant to be in contempt of its prior visitation order and later sentenced her to six months in jail.[10] By motion dated March 9, 1995, Appellant moved to vacate the findings of the Maryland court purportedly "on the grounds that the West Virginia Department of Human Resources had been given custody of Willow."[11] This motion was denied on the same date.

On March 20, 1995, Appellant filed a petition in West Virginia seeking to have Willow and her brother[12] made wards of the court pursuant to West Virginia Code §§ 49–6–1 to –9 (1995). At a hearing before Judge Cookman on April 17, 1995, the court questioned Appellant regarding her failure to serve Appellee with a copy of the petition seeking to have Willow made a ward of the court and further indicated "that there does not appear to be jurisdiction to consider said Petition. . . ."[13]

On May 31, 1995, the Maryland court held a hearing on Appellee's motion to change custody.[14] Appellant faxed a request for a continuance through her current counsel on the date of the hearing, without advising the court or Appellee that she had filed a pro se UCCJA petition in West Virginia on May 24, 1995. The Maryland court did not grant the requested continuance "[b]ecause . . . [her request] was filed late, and because Mrs. Rock had discharged her previous counsel without any cause we could see. . . ." After weighing both the abuse allegations and the conduct of Appellant,[15] the Maryland court concluded that "[s]ince the abuse is not prov-

---

8. Apparently, a "Blue Note" is an informal means of correspondence between the Maryland court and counsel which involves the use of a preprinted form, presumably blue in color.

9. *See supra* note 8.

10. The court did allow for the purging of the contempt charge and jail sentence provided that Appellant permitted visitation between Willow and her father.

11. There is no order in the record provided to this Court that supports this claim. The West Virginia guardian ad litem, the only counsel to appear for oral argument of this case on January 17, 1996, represented that Appellant voluntarily gave custody of Willow to the West Virginia Department of Health and Human Services for two days at some point in time.

12. Willow's brother is not the subject of this matter as Appellee is not his father.

13. By order dated April 21, 1995, however, the court did grant Appellant 10 days in which to file a memorandum of law addressing the issue of jurisdiction.

14. While the motion seeking a change in custody is not in the record provided to this Court, other documents refer to the filing of this document on February 1, 1995.

15. The court further noted in its June 6, 1995, order that "we find Mrs. Rock's credibility and

en, Mr. Rock appears the more stable parent ..." and awarded Appellee pendente lite custody,[16] by order dated June 6, 1995. The custody change included supervised visitation for Appellant, the continued involvement of Ms. Ramon, and authorization for unannounced inspections of Appellee's home by the Maryland Department of Social Services. On June 16, 1995, Appellant filed a notice of appeal in the Court of Special Appeals for the State of Maryland with reference to the June 6, 1995, order directing a change in Willow's custody. The record provided to this Court is devoid of any additional information regarding whether an actual appeal has been filed and the status of such appeal.

Appellee filed a motion to dismiss the West Virginia UCCJA proceeding on June 28, 1995.[17] Both parties attended and were represented by counsel at the July 5, 1995, hearing on the motion to dismiss before Judge Cookman, a West Virginia circuit court judge. Upon the oral motion of the West Virginia Department of Health and Human Resources ("DHHR"), the court named the DHHR as a party to the proceedings.[18] During the course of the hearing, Judge Cookman made a telephone call to the Maryland court in the presence of the parties' counsel. Following the hearing, Judge Cook-

man entered an order on July 14, 1995, reflecting his conclusions that the Maryland court had continuing jurisdiction under the UCCJA based on the fact that the same facts and issues are presently being litigated in the Maryland court system. Through this same order, Judge Cookman granted temporary custody to the DHHR for the purpose of transferring Willow to the Anne Arundel County Department of Social Services for foster care placement pending the outcome of the Maryland proceedings. The order further directs that the June 6, 1995, order of the Maryland court awarding Appellee custody is stayed until further action and disposition by the Maryland court.[19]

Appellant filed her appeal with this Court on August 4, 1995. Appellee moved this Court for a partial lift of stay on October 16, 1995, to permit visitation with Willow. Jane Moran, the West Virginia guardian ad litem appointed by this Court, filed a response to Appellee's request for visitation with Willow on October 17, 1995, indicating that she had no problem with such visitation. Judge Cookman held a hearing on December 1, 1995, for the purpose of scheduling visitation between Appellee and Willow. At the time of oral argument in this case, it appears that at least four scheduled visits have occurred

conduct to be suspect and we believe the child is endangered by being in her presence."

16. The court stated its reason for awarding custody to Appellee on a temporary basis as being predicated on the "recogni[tion] that this matter is far from concluded and [the] wish[ ] to proceed with all protection for the child."

17. Ms. Dart, Willow's Maryland court-appointed attorney, filed a document with the West Virginia court joining in Appellee's motion to dismiss the UCCJA petition. In reliance on the testimony given by Ms. Ramon, the Maryland social worker, at the May 31, 1995, hearing, Ms. Dart opined that:

Willow Red Wing Rock is in an unstable and unsafe environment so long as she resides with her mother Searene Two Feathers Rock, that she has been subjected to emotional abuse by her mother, that her father Mr. Bahe Rock is a fit and proper person to have custody of her, that she is best served by being in the custody of her father ..., and that she should be placed immediately into the custody of her father....

18. The DHHR submitted a written response to Appellee's motion to dismiss the UCCJA petition which stated, in part, that:

1. That the West Virginia Department of Health and Human Resources has conducted an investigation into the allegations that Willow Rock, the infant child, is in danger as the result of the possibility that the child may be removed from the state of West Virginia and may be returned to the custody of the natural father.

2. The West Virginia Department of Health and Human Resources believes that the removal of the child by the father out of the state of West Virginia may subject the child to sexual abuse.

3. Although custody of the said child has been awarded by a Court in the state of Maryland to the father, your West Virginia Department of Health and Human Resources has received allegations that the issue of sexual abuse has not been adequately dealt with by the Maryland Court.

19. The July 14, 1995, order automatically stayed its implementation for ten days to permit Appellant the opportunity to appeal to this Court and further provided that the West Virginia proceeding would be dismissed from the court's docket as soon as the Maryland court has its next hearing in connection with this matter.

between Appellee and Willow.[20] During the pendency of this appeal, a Maryland Special Court of Appeals entered an order on March 26, 1996, upholding the lower court's award of custody to Appellee.[21]

\* \* \*

The UCCJA addresses in mandatory terms the continuing jurisdiction of a court in which custody proceedings are pending. West Virginia Code § 48–10–6, which is entitled "Simultaneous proceedings in other states" provides that:

> (a) A court of this State *shall not* exercise its jurisdiction under this article if at the time of filing the petition a proceeding concerning the custody of the child was pending in a court of another state exercising jurisdiction substantially in conformity with this article, unless the proceeding is stayed by the court of the other state because this State is a more appropriate forum or for other reasons.

*Id.* (emphasis supplied). Before proceeding on any petition in a custody proceeding, a court has an affirmative obligation to investigate whether proceedings are pending in other states. *See* W.Va.Code § 48–10–6(b). In addition, when a court discovers mid-proceeding that a custody matter is pending in another state, the court is required to "stay the proceeding and communicate with the court in which the other proceeding is pending to the end that the issue may be litigated in the more appropriate forum and that information be exchanged[.]" W.Va.Code § 48–10–6(c). It is apparent from these provisions that whenever a jurisdictional issue arises that involves a pending proceeding, the UCCJA favors the resolution of custody disputes in the judicial forum in which the issue is pending. *But see* W.Va.Code § 48–10–7 (providing that court may decline to

exercise its jurisdiction on grounds of forum non conveniens).

Appellant concedes that West Virginia Code § 48–10–6 "is the one W.Va.Code Section, that if applied simply as written . . . could arguably be employed to deny jurisdiction in this case." In an attempt to circumscribe the mandatory language concerning simultaneous proceedings, however, Appellant contends that the Maryland court's modification of custody is unenforceable since it was issued to punish her for taking Willow out of state. She further argues that the custody change was not made with the best interests of the child in mind and therefore, is undeserving of enforcement pursuant to the objectives of the UCCJA.

We recognized in *Arbogast v. Arbogast,* 174 W.Va. 498, 327 S.E.2d 675 (1984), that some states have refused to enforce decrees that were issued in response to a party's failure to comply with court orders rather than out of any determination which is focused on the child's best interests. *Id.* at 505, 327 S.E.2d at 682 (citing *In re Lemond,* 182 Ind.App. 626, 395 N.E.2d 1287, 1291 (Ind.Ct.App.1979); *Slidell v. Valentine,* 298 N.W.2d 599, 605 (Iowa 1980); *Holt v. District Court,* 626 P.2d 1336, 1344 (Okla.1981); *Brooks v. Brooks,* 20 Or.App. 43, 530 P.2d 547, 551 (1975)); *see also* UCCJA § 13, 9 U.L.A. § 13 commissioners' note (1988); Brigitte M. Bodenheimer, *Progress Under the Uniform Child Custody Jurisdiction Act and Remaining Problems: Punitive Decrees, Joint Custody, and Excessive Modifications,* 65 Cal.L.Rev. 978, 1003–12 (1977). Discussing the nature of this "punitive decree" exception, we commented in *Arbogast:*

> ˙ 'This principle . . . is narrow; foreign decrees are punitive only if a sister state changes or awards custody, without regard

**20.** Ms. Moran advised the Court during oral argument that the first two visits were successful; the third visit which occurred around Christmas 1995 went "not so well;" and the fourth visit occurring around New Year's Day 1996 was described in terms of proceeding "not well."

This Court wishes to commend Ms. Moran for her efforts as guardian ad litem in this case. She travelled from Mingo County to Pendleton County; she obviously spent a significant amount of time to both investigate and clarify the relevant

issues; she was the only lawyer to appear for oral argument in this case; and she has continued to fulfill her critical role by providing us with a copy of a recent decision issued by the Maryland Court of Special Appeals pertaining to this matter.

**21.** A formal divorce decree was entered by the Maryland court on July 11, 1995. This decree did not alter the June 6, 1995, award of custody to Appellee.

to the best interest of the child, solely to punish one parent for disregarding its authority ... [It] applies only when a court deprives a parent of custody primarily on the ground that he or she violated some provision of [a] prior decree or moved from [the] jurisdiction, whether or not the departure contravened a court order, and not merely because a decree reflects that the court disapproves of a parent's conduct.... *Spaulding v. Spaulding*, 460 A.2d 1360, 1367 (Me.1983).'

174 W.Va. at 505, 327 S.E.2d at 682. Just as we did not find it necessary to invoke the "punitive decree" rule in *Arbogast*, we similarly find it unnecessary to apply those principles to this case. We note, however, that the Maryland Special Court of Appeals expressly reviewed whether the lower court's modification of custody ruling was a punitive decree and found no evidence to conclude that the ruling was punitive.

▆ The course of action and rulings made by Judge Cookman indicate an exemplary understanding of how the UCCJA drafters intended courts to interact with each other in the face of multiple proceedings involving the same issues. As we recognized in *Brockman v. Hegner*, 173 W.Va. 431, 317 S.E.2d 516 (1984), "[o]ne of the explicit purposes of the Uniform Child Custody Jurisdiction Act is to, 'Avoid jurisdictional competition and conflict with courts of other states in matters of child custody which have in the past resulted in the shifting of children from state to state with harmful effect on their well being.'" *Id.* at 432, 317 S.E.2d at 518 (citing W.Va. Code § 48–10–1). Judge Cookman fulfilled the UCCJA objective of interstate cooperation by instigating a telephone conference with Judge Cawood of the Maryland court during the midst of a court proceeding. *See* W.Va.Code §§ 48–10–1, –6. Similarly, the circuit court's denial of jurisdiction based upon the pending Maryland proceedings demonstrates compliance with the Act's objectives of "avoid[ing] jurisdictional competition and conflict." W.Va.Code § 48–10–1.

▆ In no uncertain terms, West Virginia Code § 48–10–6(a) "requires a court to

defer its jurisdiction if another state is exercising jurisdiction." *Escudero v. Henry*, 183 W.Va. 370, 374, 395 S.E.2d 793, 797 (1990). Once Judge Cookman verified that a custody proceeding involving Willow was pending in the Maryland court system and that the Maryland court did not wish to stay its exercise of jurisdiction, he had no alternative under the UCCJA but to rule against the presence of jurisdiction in this state. *See* W. Va.Code § 48–10–6(a). Numerous courts have reached the same conclusion when required to apply the simultaneous proceedings provision of the UCCJA. *See Morgan v. Morgan*, 666 P.2d 1026, 1029–30 (Alaska 1983) (holding trial court erred in refusing to dismiss for lack of jurisdiction in view of pendent Virginia proceedings); *J.D.S. v. Franks*, 182 Ariz. 81, 893 P.2d 732, 745 (1995) (upholding Arizona trial court's decline of jurisdiction given prior commencement of Florida proceeding); *G.B. v. Arapahoe County Court*, 890 P.2d 1153, 1159 (Colo.1995) (holding that UCCJA simultaneous proceedings provision barred Colorado jurisdiction); *Steele v. Steele*, 250 Ga. 101, 296 S.E.2d 570, 572 (1982) (noting that UCCJA provision regarding simultaneous proceedings "is a mandatory and not a discretionary section"); *Levinson ex rel. Levinson v. Levinson*, 354 Pa.Super. 407, 512 A.2d 14, 17 (1986) (recognizing that "'the policy against simultaneous custody proceedings is so strong ...' that courts should refrain from exercising jurisdiction to further the purposes of the Act"). Accordingly, upon the verification by a West Virginia state court that a custody proceeding is pending in another state and that the out-of-state court wishes to continue its jurisdiction, obtained in substantial conformity with the requirements and principles of the Uniform Child Custody Jurisdiction Act and properly exercised, the West Virginia court is required by West Virginia Code § 48–10–6(a) to defer its exercise of jurisdiction.

While we support the UCCJA objectives of avoiding jurisdictional battles, Appellant raises valid concerns regarding whether the Maryland Department of Social Services may have dropped the ball with regard to the allegations of sexual abuse.[22] We are further

---

**22.** This Court does not hold any opinion regard-    ing whether Appellee committed the alleged

troubled by the Maryland court's failure to provide for a transitional reunification of Willow and her father as part of its decision to modify the original custody award.[23] *See Honaker v. Burnside*, 182 W.Va. 448, 453, 388 S.E.2d 322, 326 (1989) (modifying but upholding court-created transition plan in connection with custody transfer). Since Willow has lived exclusively in her mother's custody since birth, if there is to be a change of custody it would be best for the child if such change could be accomplished "in a manner intended to foster the emotional adjustment" inherent to such a life-altering event.[24] *Id.*

■ In the event that the lower court on remand finds itself presented with the duty of directing the reunification of Willow with Appellee, such reunification should be ordered consistent with the goals discussed in *Honaker* and more recently in *Sandra M. v. Jeremy M.*, 197 W.Va. 542, 476 S.E.2d 213 (1996), concerning a gradual transition period. To accomplish these objectives, we direct the circuit court to take evidence on Willow's life since she has been in West Virginia to assist in the establishment of a plan for reconciliation between Willow and her father and to provide important information on her life for the period she has been residing in West Virginia. The circuit court

is further directed to communicate the results of such evidence and proposed plan with the Maryland court. The obvious goal of such a plan is to enable the change of custody to be accomplished with the least amount of emotional harm to the child.[25]

■ Given the upholding of the lower Maryland court's decision to grant custody to Appellee combined with this Court's recognition that Maryland was properly exercising its jurisdiction, the only avenue of relief now open to Appellant is to initiate modification proceedings. The UCCJA permits a state such as West Virginia to modify foreign custody decrees:

(a) A court of this State which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:

. . . .

(2) It is in the best interest of the child that a court of this State assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection with this State, and (ii) there is available in this State substantial evidence concerning the

---

abuse. Ms. Moran indicates in her response to the UCCJA petition that [i]f the reports of both doctors were accurate, Willow suffered sexual abuse during the period between September 28, 1992, and August 5, 1993[ ] and that "[t]he record indicates that Respondent [Appellee] had no unsupervised visitation with the child during this period." We observe, however, consistent with concerns raised by Appellant in the UCCJA petition, that the Maryland DSS appears to have closed this case of alleged sexual abuse quickly and without serious inquiry into the matter. Even if Appellee did not commit any sexual abuse, there are strong indications that someone did commit such acts against Willow. *See supra* note 2.

**23.** Neither the Maryland lower court's custody modification order nor the recent order issued by the Maryland Special Court of Appeals addresses the need for a transitional plan to permit the reunification of Willow and her father to occur with the least amount of emotional upheaval to Willow. We fervently hope that when this matter is returned to Maryland a transitional plan consistent with the goals stated in *Honaker* is crafted, as the guardian ad litem's most recent

report indicates that the child lives in fear of losing her mother.

**24.** This is particularly so in a case such as this where, according to the guardian ad litem, the child lives in fear of being parted from her mother.

**25.** Although the Maryland Special Court of Appeals has upheld the lower court's finding that custody should be awarded to Appellee, this Court is without information regarding whether Appellant intends to appeal this finding to the Maryland Court of Appeals. In the event that additional proceedings are necessary in the Maryland Court system, we suggest the court consider the possibility of utilizing a mediator if mediation as an alternate dispute resolution is in place in the state of Maryland. *See Carter v. Carter*, 196 W.Va. 239, 470 S.E.2d 193 (1996) (discussing advantages of mediation in domestic cases). Perhaps mediation could have previously served to reduce the initial levels of conflict in this case and may perhaps yet be utilized to reduce conflicts regarding any future litigation concerning custody.

456

child's present or future care, protection, training and personal relationships....

W.Va.Code § 48–10–3 (1995). The UCCJA clearly extends jurisdiction to "both the original 'custody court' and other courts to determine whether modification of the initial custody decree is in the best interest of the child." Syl. Pt. 2, *In re Brandon L.E.*, 183 W.Va. 113, 394 S.E.2d 515 (1990). Given the limited nature of the proceedings below, we are without sufficient evidence to make any observations regarding whether West Virginia has " 'substantial evidence concerning the child's present or future care, protection, training and personal relationships.' " *Id.* at 118, 394 S.E.2d at 520 (quoting W.Va.Code § 48–10–3(a)(2)(ii)). While the reality is that West Virginia, due to the passage of time during both the Maryland and the West Virginia proceedings, now has relevant information pertinent to Willow's best interests, these issues must necessarily be determined in a separate proceeding. *See Sandra M.*, 197 W.Va. 542, 476 S.E.2d 213 (1996).

Based on the foregoing, we affirm the decision of the Circuit Court of Pendleton County with directions as provided above.

Affirmed with directions.