459 S.E.2d 131

**In re JONATHAN MICHAEL D.**

**No. 22732.**

Supreme Court of Appeals of
West Virginia.

Submitted May 2, 1995.

Decided May 18, 1995.

C. Blaine Myers, Burk, Myers & Zivkovich, Parkersburg, for Jonathan Michael D.

Ernest M. Douglass, Douglass, Douglass & Douglass, Parkersburg, for Jonathan Brett D.

Susan D. Simmons and Berkeley L. Simmons, Elizabeth, for Sherry D.

Michele Rusen, Pros. Atty. for Wood County, Parkersburg, for W.Va. Dept. of Health & Human Resources.

PER CURIAM:

Sherry D.,[1] the respondent below and appellant herein, appeals a final order entered July 25, 1994, by the Circuit Court of Wood County, which terminated her parental rights to her son, Jonathan Michael D. She asserts the circuit court erred because there was no evidence she knowingly allowed her husband, Jonathan Brett D., to abuse their child; the

---

1. We follow our traditional practice in child abuse and neglect matters and other cases involving sensitive facts and do not use the last names of the parties. *See, e.g., Matter of Scottie D.*, 185 W.Va. 191, 406 S.E.2d 214 (1991); *State ex rel. Div. of Human Serv. by Mary C.M. v. Benjamin P.B.*, 183 W.Va. 220, 395 S.E.2d 220 (1990).

evidence established she complied with the terms of her improvement period; and the West Virginia Department of Health and Human Resources (Department) made no reasonable efforts to reunify the family. After reviewing the record, we find no reversible error and affirm the decision of the circuit court.

## I.

### FACTS

In February, 1993, Karol Walton, a child protective services worker with the Department, filed a petition pursuant to W.Va.Code, 49–6–1 (1992),[2] alleging five-month-old Jonathan Michael D. was an abused and/or neglected child according to W.Va.Code, 49–1–3 (1992).[3] The petition set forth the following facts:

"On February 4, 1993, the above-named child was taken to St. Joseph's Hospital and treated for a spiral fracture in right femur which injury was sustained when father was placing the child in a swing and allegedly pulled the child's leg and heard a snap. The respondent father reports that the child has been bruised on three previous occasions. In addition, the father has a history of mental illness and poor impulse control. Further, the respondent-mother is aware of said abuse by the respondent-father and has failed to adequately supervise said child and does nothing to prevent said abuse."

The circuit court determined that Jonathan was in imminent danger and ordered temporary custody placed with the Department.[4] The child was placed with his great-aunt and continues to reside in her home.

A preliminary hearing was held on February 11, 1993. Adjudicatory hearings were held on March 26, 1993, and April 26, 1993. At the conclusion of the April 26, 1993, hearing, the circuit court determined the Department had proved by clear and convincing evidence that Jonathan was subject to child abuse: "The totality of the evidence here shows a continuing and reoccurring injuries to a child which are not normal and are inconsistent with the father's explanation of

---

2. W.Va.Code, 49–6–1(a), states, in part:

"If the state department or a reputable person believes that a child is neglected or abused, the department or the person may present a petition setting forth the facts to the circuit court in the county in which the child resides, or to the judge of such court in vacation. The petition shall be verified by the oath of some credible person having knowledge of the facts. The petition shall allege specific conduct including time and place, how such conduct comes within the statutory definition of neglect or abuse with references thereto, any supportive services provided by the state department to remedy the alleged circumstances and the relief sought. Upon filing of the petition, the court shall set a time and place for a hearing and shall appoint counsel for the child."

3. W.Va.Code, 49–1–3(a), defines an "abused child":

" 'Abused child' means a child whose health or welfare is harmed or threatened by:

"(1) a parent, guardian or custodian who knowingly or intentionally inflicts, attempts to inflict, or knowingly allows another person to inflict, physical injury, or mental or emotional injury, upon the child or another child in the home; or

"(2) Sexual abuse or sexual exploitation; or

"(3) The sale or attempted sale of a child by a parent, guardian, or custodian[.]"

W.Va.Code, 49–1–3(g)(1), defines a "neglected child":

" 'Neglected child' means a child:

"(A) Whose physical or mental health is harmed or threatened by a present refusal, failure or inability of the child's parent, guardian or custodian to supply the child with necessary food, clothing, shelter, supervision, medical care or education, when such refusal, failure or inability is not due primarily to a lack of financial means on the part of the parent, guardian or custodian; or

"(B) Who is presently without necessary food, clothing, shelter, medical care, education or supervision because of the disappearance or absence of the child's parent or custodian[.]"

The statute was amended in 1994. The minor changes do not affect our determination of this case.

4. See W.Va.Code, 49–6–3 (1992), which states, in part:

"(a) Upon the filing of a petition, the court may order that the child alleged to be an abused or neglected child be delivered for not more than ten days into the custody of the state department or a responsible relative, which may include any parent, guardian or other custodian pending a preliminary hearing, if it finds that: (1) There exists imminent danger to the physical well-being of the child, and (2) there are no reasonably available alternatives to removal of the child[.]"

any of the things that happened according to the medical testimony." A dispositional hearing was held May 21, 1993, and a twelve-month improvement period was granted. On November 18, 1993, the circuit court reviewed the progress of the improvement period and determined temporary custody should remain with the Department. A final hearing was held on July 14, 1994. By order entered July 25, 1994, Sherry D.'s and Jonathan Brett D.'s parental rights were terminated.[5] The evidence taken at the hearings is summarized as follows.

Ms. Walton testified she filed the petition after receiving information from the hospital that Jonathan received a fracture to his right leg. Further examinations were conducted at the hospital because child abuse was suspected, and an old injury to the right arm and three old left rib fractures were revealed. The Department also received telephone calls indicating the child was observed on at least three occasions with bruises on his face, back, and his bottom near his scrotum.

Jonathan Brett D. testified his son was fussy the night before the incident occurred and he had awakened very early the next morning. He took Jonathan downstairs and put him in the child swing. The baby's legs were folded up and he had to pull them down through the leg holes in the swing. He testified he heard the leg crack when he pulled it through. He stated that he asked Sherry D.'s stepmother, a registered nurse, to examine the baby and she believed his leg was alright.[6] Jonathan Brett D. explained the rib injuries probably occurred when he fell down a flight of stairs while holding the baby and they both hit the wall. He attributed the arm injury to an accident that occurred when he lifted the baby out of a playpen and the baby fell back against the side of the playpen and fell to the floor. He went on to relate the bruises to Jonathan's

bottom to an incident where he bounced the baby on his knee. He explained that other bruises may have occurred when the baby rolled around on their waterbed. Jonathan Brett D. denied ever intentionally hitting his son.

Of particular significance is the fact that Jonathan Brett D. admitted he was a victim of child abuse. He had undergone counseling sessions with James D. Wells, a counselor at the Worthington Center in Parkersburg, to help him work through his anger toward his mother and father. He discontinued seeing Mr. Wells when he lost his medical card because he could not afford the therapy. Mr. Wells testified he counseled Jonathan Brett D. briefly when the baby was approximately two months old. Mr. Wells identified impulse control problems and diagnosed Jonathan Brett D. as experiencing major depression.

At the April 26, 1993, hearing, Sherry D. testified she never witnessed her husband abusing their son. She supported his explanation for the baby's injuries. She testified again at the final hearing held July 14, 1994, and admitted that Jonathan's injuries were serious. However, she denied any responsibility for the injuries. Sherry D. went so far as to say it may have been possible her husband intentionally caused the injuries, but she was not certain. She still maintained it was possible the baby was injured accidently. Eventually, she claimed to have separated from Jonathan Brett D. and filed for divorce because she could not be absolutely sure her son would be safe in the same house as his father.

Jonathan's foster mother, Elizabeth M., testified Sherry D. told her she was going to "play the game" with the Department and tell them what they wanted to hear in order to get her son back. The couple then planned to reunite and move to Ohio. Sherry D. denied making those particular state-

---

5. Jonathan Brett D.'s petition for appeal to this Court was denied.

6. Barbara M., Sherry D.'s stepmother, testified Jonathan Brett D. was concerned about his son's injury and asked her to look at the baby's leg. Barbara M. failed to recognize the leg was broken and attributed the child's behavior to consti-

pation. Nevertheless, Sherry and Jonathan Brett D. transported the baby to the hospital.

The family lived with the stepmother when these incidents took place. As a registered nurse, she felt confident she would have noticed any indications of child abuse, and she felt none were present.

ments, although she admitted she would do anything to regain custody. Sherry D. testified Elizabeth M. offered her $10,000 to relinquish her parental rights to Jonathan. Elizabeth M. denied such offer.

Dr. Min Liu, a pediatrician, testified the skeletal survey report showed a nondisplaced spiral fracture of the right leg,[7] old fractures of the left 5th, 6th, and 7th ribs, and evidence of a healing right upper arm bone. It appeared to Dr. Liu that the bone scan only evidenced a broken leg; however, she admitted a radiologist is better trained to interpret these results. She testified these injuries were suspicious and may be an indication of child abuse. Otherwise, her examination revealed a healthy, well-nourished baby.

Dr. Anthony Twite, an orthopedist, testified the bone scan showed abnormalities only in the leg and the X-rays showing prior injuries to the ribs and upper right arm "may be called into question" because the bone scan is a more accurate method of detecting fractures.[8] However, his conclusions were discredited by Dr. Paul VanDyke, a diagnostic radiologist who possessed more training and experience in evaluating bone scans and X-rays.

Dr. VanDyke testified the X-ray skeletal survey illustrated an old injury to the right humerus (upper arm) which indicated a "good manifestation of trauma to the bone that didn't result in fracture but resulted in injury to the bone[.]" He opined the baby's rib injuries and right arm injury were in the process of healing and could have been sustained anywhere from weeks to months earlier. Furthermore, the spiral fracture of the right femur was the type of injury that would require "significant trauma" to inflict because an infant's bones are more flexible than an adult's. When questioned about the difference in the bone scan and X-ray results, Dr. VanDyke explained the two reports were actually consistent. A close examination of the bone scan revealed the type of injuries more readily apparent from the X-ray. The rib fractures were not as apparent from the bone scan because the injury occurred much earlier and the ribs were in a later stage of healing. Therefore, one would not expect to see heavy activity at that site.

Dr. VanDyke further testified that the parents' explanation for the baby's leg injury would be inconsistent with the medical evidence because the amount of force used to effectuate the fracture would necessarily be much more momentous than simply pulling the leg through the hole in a baby swing. He noted the injuries were clearly out of the range of expected injuries based on a five-month-old's limited activity and lack of mobility. He found the fact the baby suffered major injuries at different sites at different times significant.

Joan George, a child protective services worker with the Department, prepared a case report in June of 1994 and testified at the final hearing held July 14, 1994. She recommended termination of parental rights. Her primary concern was the parents' failure to accept any responsibility for the baby's injuries. She believed they minimized the seriousness of the problems. Furthermore, Sherry D. and Jonathan Brett D. continued to insist the injuries were not intentionally inflicted, but were caused by accidents. Ms. George testified the parents were inconsistent with following through with their need for counseling. Sherry D. attended less than ten counseling sessions during the course of the one-year improvement period. The parents also demonstrated no ability to be self-sufficient. They did obtain various employment, but lost their jobs and had to live with relatives for most of the year.

On cross-examination, Ms. George admitted Sherry D. essentially performed the tasks set forth in the family case plan. However, she felt because Sherry D. failed to

---

**7.** A nondisplaced spiral fracture means the leg bone sustained a break but was still in proper alignment.

**8.** Dr. Paul VanDyke, a diagnostic radiologist at St. Joseph's Hospital, explained that in a bone scan, a radioactive label is used on a substance that goes to the bone and illustrates the entire skeletal system at one time. The substance accumulates at the sites of osteoplastic activity (where bone cells are laying down bone to repair injuries). By using the information from the X-rays and the bone scan, medical professionals are able to identify bone fractures and traumas and estimate how long ago the injury occurred.

acknowledge responsibility for her son's injuries, the issue could not be addressed and worked on during the improvement period. In this regard, she felt Sherry D. and Jonathan Brett D. had not attempted to correct the behavior that caused the injuries. Accordingly, Ms. George was unable to conclude that Sherry D.'s level of functioning improved to the point that the safety of the child could be ensured.

Cynthia Beck, the psychologist who evaluated Sherry D., reiterated the fact that Sherry D. continued to deny responsibility for her son's injuries. Ms. Beck, however, did not recommend termination of parental rights. She prepared a report recommending Sherry D. submit to counseling and undergo an evaluation to determine if she should be placed on medication.

At the final hearing, the circuit court determined there was no reasonable likelihood the conditions of neglect or abuse resulting in the baby's injuries could be substantially corrected in the future. Accordingly, parental rights were terminated. The circuit court found the numerous injuries could not have been inflicted accidentally and neither parent had accepted responsibility for the baby's injuries. The circuit court found that in the two months preceding the final hearing, Sherry D.'s cooperation with the Department was not sincere. Furthermore, the circuit court found her testimony was not credible. It stated Sherry D. was "only going through the motions and playing a little game with the department until such time when she gets her child back, and then she's going to reunite with the father."

## II.

### STANDARD OF REVIEW

When an action is tried upon the facts without a jury, the circuit court "shall find the facts specially and state separately its conclusions of law thereon ... [and these] [f]indings ... shall not be set aside unless clearly erroneous[.]" W.Va.R.Civ.P. 52(a). " 'A finding is "clearly erroneous" ·when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a

mistake has been committed.' " *Board of Educ. of County of Mercer v. Wirt,* 192 W.Va. 568, 579 n. 14, 453 S.E.2d 402, 413 n. 14 (1994), *quoting U.S. v. U.S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 765–66 (1948). However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm "[i]f the [circuit] court's account of the evidence is plausible in light of the record viewed in its entirety[.]" *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518, 528 (1985). Finally, "[w]hen findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference. to the trial court's findings[.]" 470 U.S. at 574, 105 S.Ct. at 1512, 84 L.Ed.2d at 529. Applying these principles to the facts of this case, we are of the opinion that the circuit court's findings were not clearly erroneous.

## III.

### FINDING OF ABUSE

Sherry D. first contends there was no evidence in the record to support the circuit court's initial finding that her conduct constituted child abuse or neglect. This Court has held that parental rights may be terminated on account of abuse even if the parent did not personally inflict the injuries. Syllabus Point 2 of *In re Jeffrey R.L.,* 190 W.Va. 24, 435 S.E.2d 162 (1993), sets forth the standard for when parental rights may be terminated for failure to prevent abuse:

" 'W.Va.Code, 49–1–3(a) (1984), in part, defines an abused child to include one whose parent knowingly allows another person to commit the abuse. Under this standard, termination of parental rights is usually upheld only where the parent takes no action in the face of knowledge of the abuse or actually aids or protects the abusing parent.' Syl. pt. 3, *In re Betty J.W.,* 179 W.Va. 605, 371 S.E.2d 326 (1988)."

The circuit court found that Jonathan Brett D. intentionally abused his son and that Sherry D. was aware of the abuse and did nothing to prevent it. As we previously

stated, this Court accords deference to such findings of fact.[9]

A review of the record does not reflect the circuit court's findings were clearly erroneous. The medical evidence shows the baby suffered three major injuries within the first five months of his life, not to mention the numerous bruises about his back, face, and bottom. Sherry D. may not have been present when the abuse occurred, as she claims, but it could reasonably be inferred she possessed knowledge the abuse was occurring. Other family members questioned how the baby sustained the bruises and reported their suspicions to the Department. Sherry D. was aware her husband had received counseling for impulse control problems after the birth of their son.[10] Standing alone this factor is not determinative. However, considering the other evidence in this case, we find the circuit court's determination that Sherry D. was aware the abuse was occurring was substantially supported by the record.

Courts oftentimes must rely upon circumstantial evidence in finding a parent liable for failing to protect his or her child from abuse even though he or she never actively participated in the abuse. Should the parents choose to support each other's version of what transpired, there may be no direct evidence to the contrary. Particularly when the victim of the abuse is a baby, as in this case, he or she cannot testify. In *State v. Adams,* 89 N.M. 737, 557 P.2d 586 (1976), the Court of Appeals of New Mexico affirmed the defendant's criminal conviction of child abuse resulting in the death of his twenty-eight-month-old daughter. The Adamses had a rationalization for all the child's bruises and injuries—from her playing with her brother to being accidently hit on the head with a glider. The defendant supported his wife's explanation for how their child was injured and eventually died. The court found his claims to be unconvincing. The circumstances leading to the child's death supported the inference that the father knew the abuse was occurring and failed to take action to stop it.[11] *See also State v. Williquette,* 129 Wis.2d 239, 385 N.W.2d 145 (1986) (mother failed to protect seven- and eight-year-old children from their father's abuse after they reported the abuse to her); *but see Pope v. State,* 284 Md. 309, 396 A.2d 1054 (1979) (defendant's child abuse conviction reversed because she was not within the class of persons specified by the statute, i.e., a parent or guardian, even though she witnessed a friend beat her baby to death and did nothing to stop it).

## IV.

## TERMINATION OF PARENTAL RIGHTS

Sherry D. contends the circuit court erred in terminating her parental rights because she complied with the terms set forth in the family case plan during the improve-

9. As we recognized in *In re Elizabeth Beth,* 192 W.Va. 656, 659, 453 S.E.2d 639, 642 (1994):
"Consistent with our cases in other areas, we give appropriate deference to findings of the circuit court. In this regard, the circuit court has a superior sense of what actually transpired during an incident, by virtue of its ability to see and hear the witnesses who have firsthand knowledge of the events. Appellate oversight is therefore deferential, and we should review the circuit court's findings of fact following an evidentiary hearing under the clearly erroneous standard. If the circuit court makes no findings or applies the wrong legal standard, however, no deference attaches to such an application. Of course, if the circuit court's findings of fact are not clearly erroneous and the correct legal standard is applied, the circuit court's ultimate ruling will be affirmed as a matter of law."

10. Studies indicate that victims of child abuse are at a greater risk of becoming perpetrators of abuse to their own children. Child abusers that were victims themselves liken abuse with proper parenting skills. *See* Dean M. Herman, *A Statutory Proposal to Prohibit the Infliction of Violence Upon Children,* 19 Fam.L.Q. 1, 20–21 (1985) (parents justify the abuse they inflict on their children by the treatment they received and such justifications are very difficult to overcome).

11. In *Santillanes v. State,* 115 N.M. 215, 849 P.2d 358 (1993), the Supreme Court of New Mexico held the application of the civil negligence standard went beyond the intended scope of the criminal child abuse statute. Mr. Adams' conviction was not reversed, however, because the court declined to retroactively apply the criminal negligence standard.

ment period.[12] Ms. George admitted Sherry D. performed the required tasks. However, the recommendation to terminate parental rights was due to the fact that Sherry D.'s attitude and beliefs did not change during the improvement period. She never accepted responsibility for Jonathan's injuries and only during the last few months of the improvement period did she admit even the possibility that Jonathan Brett D. intentionally inflicted the injuries. The family case plan specifically provided "goal achievement will be measured by the level of change effectuated by participation in the identified tasks and not by mere compliance." Furthermore, this Court has recognized it is possible for an individual to show "compliance with specific aspects of the case plan" while failing "to improve ... [the] overall attitude and approach to parenting." *W.Va. Dept. of Human Serv. v. Peggy F.*, 184 W.Va. 60, 64, 399 S.E.2d 460, 464 (1990).

■ The assessment of the overall success of the improvement period lies within the discretion of the circuit court "regardless of whether or not the individual has completed all suggestions or goals set forth in family case plans." *In Interest of Carlita B.*, 185 W.Va. 613, 626, 408 S.E.2d 365, 378 (1991). Syllabus Point 6 of *Carlita B.* states:

> "At the conclusion of the improvement period, the court shall review the performance of the parents in attempting to attain the goals of the improvement period and shall, in the court's discretion, determine whether the conditions of the improvement period have been satisfied and whether sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child."

Of particular concern to the circuit court was the fact that Sherry D.'s behavioral change during the last few months of the improvement period was an attempt to deceive the Department. There was evidence she was merely going through the motions to appease the Department while her true intentions were to reunite with Jonathan Brett D. and move out of the State. The circuit court was particularly concerned about the baby's safety should Sherry D. reunite with her husband. Thus, the circuit court found there was no substantial likelihood the conditions had changed. The circuit court is in the best position to judge a witness's credibility, and we find nothing in the record to lead this Court to a different conclusion.

■ On the issue of the improvement period, we *sua sponte* address an issue of particular concern to this Court. We have stated: "During the improvement period, the status of the child(ren) and the progress of the parent(s) in satisfying the conditions of the improvement period *should be monitored by the circuit court on a monthly basis.* To the extent possible, such review should also incorporate the multi-disciplinary approach, with social workers and other helping personnel present in the court with attorneys and parties to review progress and assure the program is being followed and improvement being made." *Carlita B.*, 185 W.Va. at 625, 408 S.E.2d at 377. (Emphasis added). The improvement period was ordered in June of 1993. On November 18, 1993, the circuit court conducted its only hearing reviewing the progress of the parents before the final hearing was held on July 14, 1994. It must be emphasized that at that point the child had spent more than half of his life in foster care. A single six-month review of a one-year improvement period is woefully inadequate, especially where such a young infant is involved. Frequent monitoring enables a speedy return of the child should the parents demonstrate substantial improvement. "[T]he significance of a six-month period in the first three years of life must once again be viewed as an extremely vital time in the course of a child's human development." *Carlita B.*, 185 W.Va. at 624, 408 S.E.2d at

---

**12.** The family case plan submitted by Ms. George in May of 1993 outlined numerous goals and tasks for Mr. and Mrs. D. They were to read booklets entitled *All That a Child Can Be* and *Toddlers* and prepare various reports for the Department. For instance, they were required to prepare reports detailing the reasons they felt the Department removed the baby from their care and explain their understanding of what must be accomplished in order for them to regain custody. Sherry D. was required to participate in individual therapy sessions on a monthly basis and apprise her social worker of her efforts to comply with the case plan.

376. It also allows the circuit court to see to it that the Department is making reasonable efforts toward the goal of family reunification and to assure the child is receiving all necessary services.

■ We do not, however, find reversible error in the circuit court's lack of diligence in monitoring this case. We are not convinced that additional proceedings before the circuit court would have made any difference in the final outcome of this case because Sherry D. failed to ever acknowledge that Jonathan was an abused child. Without such revelation, the circuit court found it unlikely Sherry D. would take steps to prevent further abuse from occurring.

## V.

### DUTY OF DEPARTMENT

■ Sherry D.'s final argument is that the Department failed to make a reasonable effort to reunify the family pursuant to W.Va.Code, 49–6–5 (1992). This assignment of error is without merit. The Department promptly prepared the family case plan,[13] submitted the plan to the circuit court in May of 1993, and took immediate steps to offer services. Sherry D. failed to take advantage of the opportunity to work with the Department until the end of the improvement period and even then did not truly accept the fact that the abuse occurred. The failure to reunify the family in this case does not lie with the Department.[14] Sherry D. failed to bear the responsibility of demonstrating to the Department and the circuit

court sufficient progress and improvement in order to regain custody.

## VI.

### CONCLUSION

For the foregoing reasons, we find the Circuit Court of Wood County did not abuse its discretion in terminating the parental rights of Sherry D. Accordingly, the judgment is affirmed.

Affirmed.

---

**13.** The purpose of the family case plan " 'is to clearly set forth an organized, realistic method of identifying family problems and the logical steps to be used in resolving or lessening these problems.' " *State ex rel. W. Va. Dept. of Human Serv. v. Cheryl M.*, 177 W.Va. 688, 693, 356 S.E.2d 181, 186 (1987), *quoting* W.Va.Code, 49–6D–3(a) (1984).

**14.** Victor I. Vieth in *The Mutilation of a Child's Spirit: A Call for a New Approach to Termination of Parental Rights in Cases of Child Abuse*, 20 William Mitchell L.Rev. 727, 731 (1994), recognizes the arduous task faced by social services in attempting to reunite the family:

"It is often difficult, however, to reunite victims of physical or sexual abuse with their

offending parents. Parents charged with abuse or neglect of a child 'are not candidates for quick change' and often require 'long-term treatment and long-term support in order to achieve *any* measure of success.' One study concludes that the success rate of treating abusive parents may be as low as forty percent.

"For social workers, the greatest challenge may be to help a nonoffending parent accept the fact that abuse has taken place. Typically, '[n]on-offending parents tend to lie to cover for the guilty parent because of their emotional ties to that person.' " (Emphasis in original; footnotes omitted).

Although there is generally a strong public policy in favor of encouraging loyalty in one spouse to the other, a parent's first commitment must be to the protection of his or her child.