**STATE OF WEST VIRGINIA
SUPREME COURT OF APPEALS**

*In re* **C.B.-1**

**No. 20-1031** (Kanawha County 19-JA-106)

**MEMORANDUM DECISION**

Petitioner Grandmother C.B.-2, by counsel Michael Payne, appeals the Circuit Court of Kanawha County's November 30, 2020, order terminating her guardianship and custodial rights to C.B.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Mindy M. Parsley, filed a response in support of the circuit court's order. The guardian ad litem, Sharon K. Childers, filed a response on behalf of the child in support of the circuit court's order and a supplemental appendix. On appeal, petitioner argues that the circuit court erred in terminating her guardianship and custodial rights and in failing to require the DHHR to attempt reunification of the family.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In February of 2019, the DHHR filed an abuse and neglect petition[2] alleging that petitioner—the child's legal guardian and grandmother—abused and neglected the child by virtue of her substance abuse, among other issues. According to the petition, the child's great-grandfather reported that petitioner was drinking alcohol and fell, after which she required help to get up.

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990). Additionally, because the child and petitioner share the same initials, we will refer to them as C.B.-1 and C.B.-2, respectively, throughout this memorandum decision.

[2]The DHHR later filed an amended petition to include the child's father as a respondent in the proceedings.

1

According to the great-grandfather, petitioner was an alcoholic and drank regularly. The great-grandfather also reported that the home was "deplorable" because of dirt and clutter throughout. According to the petition, the great-grandfather told petitioner to call him later in the day to confirm that she was alright. When he did not hear from her, the great-grandfather returned to petitioner's home and found the child—who was six years old, autistic, and nonverbal—"outside roaming around." Petitioner was passed out on the floor and was ultimately transferred to a hospital by ambulance where she was treated for a blood clot in her lung. A nurse who treated petitioner indicated that the hospital referred petitioner's case to Adult Protective Services due to her intoxication and the amount of bruising she displayed upon admission. Petitioner explained, however, that her bruising was from having fallen on three separate occasions. The petition further alleged that the child's teacher disclosed to CPS that petitioner had been sending the child to school in soiled diapers because she was unable to change them. Based upon these facts, the DHHR alleged that petitioner abused and neglected the child by virtue of her substance abuse, her failure to provide the child with adequate housing, and her inability to meet the child's basic needs.

In May of 2019, the circuit court held an adjudicatory hearing, during which petitioner stipulated to the fact that the home "was in an unsafe, unsanitary and uninhabitable condition." Based on this stipulation, the court adjudicated petitioner of having neglected the child. The court also granted petitioner's motion for a post-adjudicatory improvement period and ordered that she participate in parenting and adult life skills education and submit to random drug screens.

Because of the child's special needs, the DHHR ultimately placed him in a home outside of Kanawha County. As such, travel was necessary to facilitate visitation with petitioner. As early as June of 2019, the child's visitation transportation provider indicated that the child demonstrated extreme behaviors during transport, including damaging the vehicle, kicking, and yelling. According to the transportation notes, the child's foster family had informed Child Protective Services ("CPS") that he would react this way to transportation. The foster family also indicated early on that the child's behavior following visits was disruptive and created issues with other children in their home who also have special needs. As such, the transportation provider explained that "travel time . . . has started to affect [the child's] behavior and he has started to get destructive during the transport and has to be monitored closely to ensure safety as he is getting out of his car seat." The provider recommended that visits either be decreased or moved to a location closer to the child's foster home.

Thereafter, the court held a series of review hearings, beginning in August of 2019. At that time, the court found that petitioner was substantially complying with the terms of her improvement period but denied her request for increased visitation with the child. During this first review hearing, the court ordered the DHHR to help facilitate transportation for petitioner in order for her to meet the child halfway for visits. The court also noted that the DHHR had not yet implemented parenting services for petitioner and ordered that it do so immediately. Around this time, the court ordered petitioner to submit to a psychological evaluation for parental fitness.

Provider notes from a visit at petitioner's residence in September of 2019 indicate that petitioner allowed the child to escape her yard and was unable to pursue him. According to the provider's notes, the child's great-grandfather also attended the visit. After petitioner let him into the yard through the locked gate, the great-grandfather told petitioner that the gate remained open,

which petitioner denied. The provider noted, however, that as petitioner denied the gate was open, she was "pulling on it and opening it about a foot or so." The great-grandfather "repeated it louder saying, 'hey the gate is open!'" and petitioner "replied with a laugh, 'no it isn't.'" The great-grandfather then emphatically said "you're holding it open right now" and followed that up with a warning that the child was headed toward the open gate. According to the provider, the child "quickly slipped under [petitioner's] arm and took off running down the sidewalk." Petitioner was only able to run "about 4-5 steps" after the child before stopping. It was the visitation supervisor who was eventually able to catch up to the child and return him to the yard.

At a review hearing in October of 2019, the court ordered that petitioner be given "make-up supervised visitation . . . in addition to her regular supervised visitation." According to a court summary filed in November of 2019, the child continued to demonstrate increasingly dangerous behavior during transportation to visits. The transportation provider explained that the child freed himself from his car seat during a recent trip and kicked the provider in the back of the head. The provider also indicated that the child repeatedly undressed himself, which required the provider to pull over several times to dress him. This made the child angry and caused him to "scream relentlessly." Again, the provider requested that visits be scheduled in Tyler County, where the child was placed, in order to ensure the child's safety.

At a review hearing in November of 2019, the guardian informed the court that petitioner failed to show up for her parental fitness evaluation. Petitioner informed the court that she forgot about the evaluation. The DHHR's court summary also addressed the issues with the child's transportation for visits and indicated that "the minor child continues to be a safety risk to himself and the transporter because he does not travel well." Accordingly, the guardian recommended moving visitation to Tyler County and that it would be more appropriate for petitioner to travel to the visitation location. Petitioner, however, informed the court that she could not travel because of work "and that she wanted the visitation to occur at her home." The court then suspended visits between petitioner and the child, noting its concern that petitioner "desire[d] the minor child to continue to be transported despite the risk to the child." The court explained, however, that if the DHHR could schedule supervised visitation over the holidays and petitioner was willing to travel to Tyler County, she could have supervised visitation under those circumstances. The court also explicitly ordered petitioner to attend her rescheduled psychological evaluation.

At a hearing in January of 2020, petitioner moved for visitation to be scheduled at a location halfway between her home and the child's foster home, but the guardian objected because of the continued safety concerns for the child during travel. The court, finding it appropriate to put the travel burden on petitioner, ordered that visitation would continue in Tyler County, but that the DHHR was directed to identify a weekend visitation location and help facilitate petitioner's travel. However, according to a court summary from February of 2020, the DHHR acknowledged that there had been a delay in finding a transportation provider for petitioner to facilitate visits.

After finally receiving the results of petitioner's psychological evaluation, the guardian and the DHHR expressed an intention to seek termination of petitioner's improvement period in February of 2020. According to the psychological report, petitioner disclosed a lengthy history of CPS involvement, including a period of two years when CPS had to intervene in regard to petitioner and her daughter. The psychologist reviewed material from the proceeding involving

petitioner's daughter and indicated that the matter was initiated when the daughter was brought to a hospital by emergency services and the police. Petitioner could not be located for several hours, and, when she did appear, she was intoxicated. After the daughter was released into petitioner's care, petitioner contacted CPS the next day and asked that CPS take custody of her daughter. After the daughter was again placed in the hospital, petitioner initially refused to come to the hospital, but eventually arrived and was again intoxicated. Petitioner told CPS they "could have her child and then left the hospital." Petitioner disputed this account of the events and indicated that her daughter, who was bipolar, was not removed from her home by CPS, but that she was placed with petitioner's parents until the daughter turned eighteen years old. The evaluator noted, however, that the DHHR substantiated petitioner's alcohol abuse during that prior CPS investigation.

In regard to C.B., the evaluator also discussed with petitioner an incident in which she became so intoxicated in Florida that she passed out while caring for the child and police responded to the situation. Petitioner disputed this account and indicated that she believed law enforcement was called because of the child's behavior. During her evaluation, petitioner acknowledged that she sometimes "had a little too much" to drink and cared for the child while under the influence but denied a problem with alcohol. She also informed the evaluator that she stipulated at adjudication because "it was the quickest way to get [the child] back" and clarified that she did not believe that she had done anything that was either abusive or neglectful. The evaluator noted that because of the child's autism and non-verbal condition, he "will require 24/7 care for his entire life" that is "very demanding and often involves long-term therapies and rehabilitation efforts with constant monitoring and safeguarding." According to the psychologist, these heightened needs required someone who is "fully engaged and not under the influence [of alcohol]." The psychologist concluded that, "[w]ithout acceptance of responsibility, there is little likelihood that [petitioner] is motivated to change her behavior" and that petitioner indicated that she did not need treatment. This caused the psychologist significant concern, especially in light of C.B.'s vulnerability. Based upon several factors, including her refusal to accept responsibility for her conduct, the psychologist indicated that petitioner's prognosis for improved parenting was "very poor."

At a hearing in May of 2020, the guardian moved for the termination of petitioner's improvement period. The court granted the motion and ordered that petitioner would have no additional supervised visitation. The court then held a dispositional hearing in July of 2020, during which it heard testimony from a CPS worker but ultimately continued the matter so that additional testimony could be obtained. At the hearing, petitioner's counsel represented that petitioner intended to check into an alcohol treatment program.

At the continued dispositional hearing in August of 2020, the court heard testimony from the psychologist who performed petitioner's evaluation that was consistent with that report. During petitioner's cross-examination of the psychologist, she clarified that although she is not an expert in substance abuse treatment, she was considered "an expert in substance abuse as it applies to parental fitness" and that she is "trained to treat substance abuse." The psychologist also confirmed that she was not aware that petitioner had not tested positive for alcohol on any screens during the proceedings but indicated that this information would not change her prognosis given that "alcohol was processed very quickly in the body, and random screenings often miss alcohol." The psychologist was also unaware that petitioner had completed an alcohol abuse program several

months after her evaluation but stated that this also would not change her opinion, as the psychologist believed that petitioner "needs to establish a period of sobriety while she's under the scrutiny of the [c]ourt and CPS, to ensure that it's a long-term thing and not just a temporary thing." The psychologist also expressed concerns about petitioner participating in treatment "at the last minute" because of motivation to simply have the child returned to her custody, instead of making a genuine change in her behavior. The psychologist reiterated that petitioner denied that she had issues with alcohol and that she still did not know "at the eleventh hour . . . that [petitioner] even accepts that drinking while she's caring for this child is problematic." In short, the psychologist concluded that because petitioner had not complied with the recommendations from the evaluation, that her prognosis for petitioner had not changed.

Petitioner testified that she now believed that if she were under the influence of alcohol that it would impair her ability to care for the child. She further testified that she had completed a twenty-eight-day alcohol rehabilitation program and subsequently began participating in an outpatient program. Petitioner also indicated that she underwent a similar treatment program for alcohol abuse in 2002 that was unsuccessful. She additionally discussed her history of working with children with special needs as a teacher's aide for many years. The court then inquired as to issues surrounding visitation, and a DHHR worker explained that the DHHR "arranged for [petitioner] to meet [the child] at the DHHR in Tyler County . . . and she did not go to the visitations." The worker clarified that, at one point, services were interrupted due to the COVID-19 pandemic but that the circuit court also terminated visits when it terminated petitioner's improvement period. This resulted in petitioner having not visited the child since October of 2019. The guardian also indicated that the DHHR was "ordered to assist with [petitioner's] transportation . . . and . . . underst[ood] that the DHHR did that." The guardian further indicated that petitioner "was part of that problem, in not making herself available to travel to see" the child. At the conclusion of the hearing, petitioner again asked the court to transport the child to supervised visitation at her home in Kanawha County. The court declined this request but ordered the DHHR to ensure that they provided petitioner transportation to visits with the child in Tyler County. The court further reinstated petitioner's improvement period.

Shortly after the hearing, the guardian filed a motion to reconsider the court's reinstatement of petitioner's improvement period and a renewed motion to terminate her guardianship rights. In support, the guardian argued that petitioner had already received over one year under her post-adjudicatory improvement period, which was "double the statutory time frame" for such improvement periods. The guardian further argued that granting an additional improvement period only delayed the child's permanency. The court held a hearing on the motion in October of 2020, after which it found that its prior order resulted in the minor child's placement having been potentially disrupted and delayed contrary to his best interests and the timelines set forth in abuse and neglect cases. The court found that priority must be given to obtaining finality for the child and vacated its prior order.

The court then turned to the motion to terminate petitioner's guardianship rights and found that although petitioner complied with some of her services, several concerns about her ability to properly parent the child persisted throughout the proceedings. The court noted that one provider indicated that "after working with [petitioner] for months, . . . she 'still does not seem to understand the severity or problems [the minor child] faces as he gets older'" which caused the provider to

opine that petitioner would be unable to care for the child's extensive needs. Further, the court cited evidence from one provider that the child would "severely act out after visitations because [petitioner] did not enforce any rules, . . . fed him junk food, [and] gave in[ to] his demands." Even with supervision, petitioner struggled to control the child during visits. The court also found that although petitioner was asked to travel for visits because regular travel became too dangerous for the child, she did not take advantage of any visits in Tyler County. The court cited extensively to petitioner's psychological evaluation, noting her refusal to take responsibility for her conduct or acknowledge that she abused or neglected the child. The court also cited to the psychologist's testimony that petitioner "never secured critical therapies and interventions for the minor child's autism, which may explain why he has made such progress while being in his specialized foster care home." Further, the court noted petitioner's late attempt to address her substance abuse. After continuing on an improvement period for over a year, the court terminated the improvement period in May of 2020. Despite this extended period, petitioner "did not attempt to enroll in any alcohol treatment until the day of her dispositional hearing in July 2020." The court also highlighted petitioner's own CPS history of substantiated abuse and/or neglect involving her daughter. Based on the foregoing, the court found that there was no reasonable likelihood that petitioner could substantially correct the conditions of abuse and neglect in the near future and that the best interests of the child required termination of her rights. As such, the court terminated petitioner's guardianship and custodial rights to the child.[3] It is from the dispositional order that petitioner appeals.

The Court has previously established the following standard of review:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner first alleges that the circuit court erred in terminating her guardianship and custodial rights. Petitioner argues that to support termination, the court was required to find that there was no reasonable likelihood that she could substantially correct the conditions of abuse

---

[3]The parents' parental rights were also terminated below. The permanency plan for the child is adoption in the current foster home.

and neglect in the near future. Petitioner cites to West Virginia Code § 49-4-604(d),[4] which sets forth several circumstances in which there is no reasonable likelihood that the conditions of abuse and neglect can be substantially corrected in the near future and asserts that none of these circumstances apply to her. Petitioner recognizes, however, that this list is non-exhaustive. This argument, however, ignores the fact that the evidence overwhelmingly supports the circuit court's finding that petitioner failed to acknowledge the conditions of abuse and neglect at issue.

This Court has routinely held that

> [i]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

*In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) (citation omitted). As the psychologist who evaluated petitioner for her parental fitness indicated in her report and testimony, petitioner failed to acknowledge that she behaved in any manner that was abusive or neglectful; explained that she did not believe that being under the influence while caring for the child, who has extensive special needs and requires constant attention, was a problem; and only stipulated at adjudication in an effort to quickly regain custody of the child. Further, a service provider indicated that petitioner did not recognize the severity of the child's issues, raising concerns that she could not properly care for the child. This evidence fully supports the circuit court's finding that petitioner did not acknowledge the relevant conditions, despite her testimony at the August of 2020 hearing to the contrary.

It is true that petitioner eventually testified that she realized caring for the child while under the influence was problematic and that she realized she required substance abuse treatment, but the circuit court considered this testimony and made a credibility determination that we decline to disturb on appeal. *Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997) ("A reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations."). Indeed, petitioner displayed a willingness to stipulate to adjudication not because she believed that she engaged in any inappropriate conduct, but because she sought to expedite the proceedings. As such, both petitioner's evaluator and the circuit court questioned her sincerity in making admissions at the August of 2020 hearing after failing to do so for approximately eighteen months during the proceedings. In short, petitioner cannot be entitled to relief upon an argument that the circuit court, as the trier of fact, found that her late testimony lacked credibility.

Petitioner also argues that the DHHR failed to offer expert testimony in regard to the child's need for continuity of caretakers and the amount of time it would take to integrate the child into a stable and permanent home, among other considerations. It is unclear why petitioner believes

---

[4]Petitioner actually cites to West Virginia Code § 49-6-5(b), a statute that was repealed in 2015 and replaced by West Virginia Code § 49-4-604.

expert testimony is necessary on these issues, however, and she provides no citation to any authority that would require such evidence. Instead, West Virginia Code § 49-4-604(c)(6)(A) and (B) simply require that "in fixing its dispositional order the court shall consider the following factors: (A) The child's need for continuity of care and caretakers; (B) The amount of time required for the child to be integrated into a stable and permanent home environment." Without providing any analysis as to how the circuit court failed to consider these factors, petitioner simply alleges that the DHHR did not produce evidence, expert or otherwise, on these issues. This is insufficient to entitle petitioner to relief. Further, this argument ignores that the DHHR introduced the child's psychological report into evidence and that the report clearly explained that the child "requires a structured, stable, and supportive home environment, offering consistent discipline and consequences for his behavior, as well as consistent emotional support, and a stimulating environment." The record further demonstrated that petitioner could not meet these requirements, as the visitation provider indicated that petitioner failed to provide structure during her visits with the child and could not control him. This included a visit in which petitioner allowed the child to escape her yard and was unable to retrieve him.

Next, petitioner argues that the circuit court erred by not requiring the DHHR to attempt reunification, but this argument is both factually and legally flawed. Petitioner appears to argue, by citing to both state and federal law, that the DHHR was required to make reasonable efforts to preserve the family and did not satisfy this duty because the child was never returned to her care. None of the authority upon which petitioner relies, however, requires that a child be returned to a parent, guardian, or custodian. Instead, the DHHR was required to make reasonable efforts to attempt such reunification, which it did. *See* W. Va. Code § 49-4-604(c)(6)(C)(iii) and (iv) (requiring courts, upon termination of parental, custodial, and guardianship rights, to consider the DHHR's efforts to preserve and reunify the family). It is uncontroverted that, in an attempt to remedy the issues of abuse and neglect in petitioner's home and achieve reunification with the child, the DHHR implemented parenting and adult life skills services for petitioner. The DHHR also sought to facilitate visitation between petitioner and the child. These services constitute the DHHR's reasonable efforts to achieve reunification, and the DHHR was not required to return the child to her care against his best interests. Further, petitioner ignores the fact that her own refusal to acknowledge the conditions of abuse and neglect made the child's return impossible. As such, petitioner is simply incorrect that the DHHR did not establish that returning the child to her home was contrary to his welfare.

In support of this argument, petitioner asserts that she passed all of her drug screens, participated in services as requested, and completed a substance abuse treatment program. She also relies heavily on her prior work with special needs children. It is important to note, however, that this evidence was considered in conjunction with her history of substance abuse and CPS intervention, including substantiated alcohol abuse in regard to her daughter. The court also considered evidence of petitioner's past participation in an alcohol treatment program to no avail. Petitioner would have this Court focus solely on the evidence that supports her position while ignoring relevant, probative evidence that the conditions for which petitioner was adjudicated have continued for years. Further, the evidence to which petitioner cites does nothing to alter the fact that a provider testified that petitioner did not seem to understand the severity of the child's issues and was unable to properly care for the child's extensive needs, as further evidenced by her inability to properly supervise the child during visits.

As this Court has explained

> "'it is possible for an individual to show "compliance with specific aspects of the case plan" while failing "to improve . . . [the] overall attitude and approach to parenting." *W.Va. Dept. of Human Serv. v. Peggy F.*, 184 W.Va. 60, 64, 399 S.E.2d 460, 464 (1990).'" *In re Jonathan Michael D.*, 194 W.Va. 20, 27, 459 S.E.2d 131, 138 (1995). Moreover, "'[t]he assessment of the overall success of the improvement period lies within the discretion of the circuit court . . . "regardless of whether . . . the individual has completed all suggestions or goals set forth in family case plans."' *In Interest of Carlita B.*, 185 W.Va. 613, 626, 408 S.E.2d 365, 378 (1991)." *In re Jonathan Michael D.*, 194 W.Va. at 27, 459 S.E.2d at 138.

*In re B.H.*, 233 W. Va. 57, 65, 754 S.E.2d 743, 751 (2014). The evidence here shows that while petitioner may have complied with the terms of her improvement period, she failed to fundamentally improve her overall attitude and approach to parenting by virtue of her repeated refusal to acknowledge the conditions of abuse and neglect at issue. Further, "[i]n making the final disposition in a child abuse and neglect proceeding, the level of a parent's compliance with the terms and conditions of an improvement period is just one factor to be considered. The controlling standard that governs any dispositional decision remains the best interests of the child." Syl. Pt. 4, *In re B.H.*, 233 W. Va. 57, 754 S.E.2d 743 (2014). Because petitioner failed to fundamentally change her attitude and approach to parenting, it was clearly not in the child's best interests to return to the home.

This is further underscored by petitioner's disregard for the child's well-being below, as demonstrated by her repeated attempts to subject the child to several hours of travel so that her wishes for visitation in her home could be met. It is important to note that, on appeal, petitioner provides no citation to the record to establish why she could not bear the burden of travel to supervised visitations after the court found that asking the child to continue enduring the stress of travel had a negative effect on his behavior and was, in fact, dangerous, given his repeated attempts to exit his safety restraints and the vehicle. The record shows that petitioner indicated that she could not attend visits because of her employment, but on appeal petitioner asserts, without citation to the record, that she lacked transportation. In short, there is nothing in the record to support petitioner's repeated attempts to subject the child to this extended transportation, and the record further shows that the DHHR made attempts to facilitate petitioner's requested accommodations for visits, to no avail. What is most telling, however, is petitioner's repeated insistence that the DHHR cater to her needs regardless of its impact on the child. In advancing this position, both below and on appeal, petitioner totally abdicates responsibility for the child's removal by asserting that "[i]t was DHHR's decision to place the child so far away from [petitioner]." This argument ignores the reality that it was petitioner's conduct that required the child's removal and that the DHHR was presented with limited options for his foster care given his extensive special needs. Further, petitioner's counsel only underscored the total disregard of the child's well-being by arguing that the child should have been repeatedly forced to travel to petitioner's residence for visits because the DHHR was willing to transport him on one occasion for a psychological evaluation. Petitioner's counsel argued that "the DHHR's full willingness to transport the child for a forensic evaluation" demonstrated "[t]he hypocrisy of requiring [petitioner] to travel to

9

Middlebourne." This argument lacks consideration for the fact that the psychological evaluation was a single event and that no other options were available, while petitioner willfully refused to put the child's needs ahead of her own by demanding that he travel repeatedly for visits. In response to the child's transportation to the psychological evaluation, petitioner's counsel callously retorted that "[h]e survived it, didn't he?" This demonstrates a total lack of interest in the child's well-being, as the fact that the child did not die during one isolated trip for a necessary evaluation in no way undermined the substantial evidence that repeated travel to petitioner's residence was not only unnecessary, had petitioner simply made the effort to visit the child, but also detrimental to the child's wellbeing.

Ultimately, the circuit court's termination of petitioner's guardianship and custodial rights was not in error. According to West Virginia Code § 49-4-604(c)(6), a circuit court may terminate parental rights upon a finding that there is no reasonable likelihood that the conditions of abuse and neglect can be substantially corrected in the near future and when necessary for the child's welfare. As set forth above, the court had ample evidence upon which to base these findings. Further, as this Court has held,

> "[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] . . . may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(d)] . . . that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011). Based on the overwhelming evidence in support of these determinations, we find no error in the circuit court's termination of petitioner's parental rights.

Further, it is important to note that allowing petitioner's reinstated improvement period to continue would have been inappropriate. According to West Virginia Code § 49-4-610(9),

> no combination of any improvement periods or extensions thereto may cause a child to be in foster care more than fifteen months of the most recent twenty-two months, unless the court finds compelling circumstances by clear and convincing evidence that it is in the child's best interests to extend the time limits contained in this paragraph.

While it is true that the proceedings below were, at times, delayed by the DHHR's failure to quickly implement services and the COVID-19 pandemic, the record also shows that petitioner is responsible for significant delays. This includes her failure to attend her psychological evaluation, a critical component for establishing recommendations to remedy conditions of abuse and neglect, because she simply forgot to attend. Further, petitioner waited until the child had been in foster care for approximately eighteen months to finally indicate to the court that she recognized that her conduct was problematic and needed correcting. By waiting until the last possible opportunity to make this admission, petitioner unnecessarily delayed the proceedings and the child's permanency.

Because granting petitioner an additional period of improvement would have extended the child's placement in foster care well beyond the fifteen month limit, and because the court recognized that no good cause existed for such delay, we find that it was appropriate for the circuit court to rescind its prior decision to reinstate petitioner's improvement period and terminate her guardianship and custodial rights.

For the foregoing reasons, we find no error in the decision of the circuit court, and its November 30, 2020, order is hereby affirmed.

Affirmed.

**ISSUED**: June 22, 2021

**CONCURRED IN BY**:

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton